# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOSEPH SELLERS, JR., *et al.*,

          *Plaintiffs*,

v.

ANTHEM LIFE INSURANCE COMPANY,

          *Defendant*.

Civil Action No. 16-2428 (TJK)

## MEMORANDUM OPINION AND ORDER

Plaintiffs Joseph Sellers, Jr., and Richard McClees serve as trustees of the SMART Voluntary Short Term Disability Plan (the "VSTD Plan" or "Plan"). The VSTD Plan is an employee welfare benefit plan regulated under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829. The Plan offers short-term disability benefits to certain rail and bus workers. From January 2010 through March 2016, Defendant Anthem Life Insurance Company ("Anthem") underwrote disability insurance that the VSTD Plan provided, and processed claims for benefits.

Plaintiffs contend that Anthem overcharged the VSTD Plan for those insurance services. In the instant lawsuit, they bring claims against Anthem for violations of ERISA's prohibited-transaction provisions, as well as claims for breach of contract and unjust enrichment. Anthem has moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 15; *see also* ECF No. 15-1 ("Def.'s Br."); ECF No. 17 ("Pls.' Opp'n"); ECF No. 18 ("Def.'s Reply"). For the reasons set forth below, the motion will be **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' ERISA claims will be dismissed for failure to state a claim. Plaintiffs' claims for breach of contract and unjust enrichment, however, will be allowed to proceed.

## I.    Factual and Procedural Background

The VSTD Plan was founded in October 2009 and was originally sponsored by the United Transportation Union ("UTU").  ECF No. 14 ("Am. Compl.") ¶¶ 5, 7.  In 2012, UTU merged into another union, the International Association of Sheet Metal, Air, Rail, and Transportation Workers ("SMART").  *Id.* ¶ 8.  In 2014, Plaintiffs Sellers and McClees were appointed by SMART as trustees of the VSTD Plan, taking the seats formerly held by two UTU-appointed trustees, Malcolm Futhey (UTU's former president) and John Lesniewski.  *Id.* ¶¶ 10, 74.

Under both UTU and SMART, the VSTD Plan has provided short-term disability benefits to plan participants, who work for railroad and commuter-bus companies.  *Id.* ¶ 12.  The schedule of benefits differs for rail and bus employees.  *Id.* ¶ 13.  Nonetheless, the essential features of the benefits are the same: the Plan offers short-term disability insurance to eligible employees, and premiums are automatically deducted from plan participants' paychecks unless they affirmatively opt out of coverage.  *See id.* ¶¶ 14-15.

The Plan engaged Anthem to provide short-term disability insurance to participating rail employees starting on January 1, 2010.  *Id.* ¶ 18.  The Plan paid Anthem the premiums deducted from participants' paychecks, and Anthem underwrote the benefits and processed claims.  *Id.* ¶¶ 18, 22.  Anthem offered its services through a series of one-year contracts.  *Id.* ¶ 45.  In 2011, Anthem, arguing that it was not being adequately compensated, successfully negotiated with the Plan for higher premiums starting in 2012.  *Id.* ¶ 31.  Anthem also "separately negotiated premiums to provide [short-term disability] benefits to bus industry participants" starting in 2012.  *Id.* ¶ 32.

Plaintiffs allege that Anthem "knowingly receiv[ed] excessive compensation" during the period from 2012 through 2014.  *Id.* ¶¶ 44-45.  Specifically, they allege that the difference

between the premiums Anthem received and the claims it paid ranged from $3.7 million to $7.1 million during those three years, representing "profit margins" of 26.2% to 49.8%. *Id.* ¶¶ 34-43. Plaintiffs also complain that, while Anthem was all too eager to seek premium increases when its profits were supposedly low, Anthem did not offer lower premiums when its profits were high. *Id.* ¶ 44.

Plaintiffs allege that Anthem, in addition to charging unreasonable premiums, also engaged in another form of misconduct. Specifically, they allege that Anthem paid "kickbacks," disguised as commissions, to a former UTU employee named Edward Carney from 2010 through 2013. *See id.* ¶¶ 61-81. During the period in question, Carney allegedly had "no business relationship with Anthem or the VSTD Plan." *Id.* ¶ 61. Nonetheless, Anthem allegedly paid Carney hundreds of thousands of dollars per year from the premiums it received. *Id.* ¶¶ 62-65. Plaintiffs claim that Anthony Martella, who worked for a company that sold insurance to SMART members and "was in the position to steer the commission business to Carney," helped "to orchestrate the payments from Anthem to Carney" (although how, exactly, is unclear). *Id.* ¶¶ 71-72. In return, Carney allegedly passed on tens of thousands of dollars from the "kickbacks" he received to Martella. *Id.* ¶¶ 66-70, 73. Plaintiffs also allege that, in 2011, Carney "slipped $2,000 into the coat pocket of then president of the UTU, Malcolm Futhey," who was also a trustee of the Plan at the time. *Id.* ¶ 74. Plaintiffs allege that the payments from Anthem to Carney "were not reasonable commissions" and "increased, dollar for dollar, the amount of the premiums paid by VSTD." *Id.* ¶¶ 77-78.

After taking office as trustees of the Plan in 2014, Plaintiffs sought to negotiate better rates. *See id.* ¶ 51. Anthem responded by proposing what Plaintiffs characterize as a risk-sharing arrangement. *Id.* ¶ 53. Until that point, Anthem had borne the risk of loss in the event

that claims exceeded premiums. *Id.* Anthem offered a deal under which Plaintiffs would pay higher premiums but receive quarterly refunds of 50% of the difference between premiums received and claims paid. *Id.* Plaintiffs evidently disliked this proposal but claim that, since it was too late to consider other offers, they accepted it by letter dated January 30, 2015. *See id.* ¶ 55 & Ex. A. Plaintiffs allege that Anthem nonetheless failed to make any of the refund payments required under the agreement. *Id.* ¶ 60.

According to Plaintiffs, Anthem subsequently took the view that the January 2015 letter had not caused a binding contract to form. *See id.* ¶ 92. Anthem sought to continue negotiating, proposing an agreement under which the refunds for 2015 and 2016 would not be paid quarterly, but in a lump sum in 2017. *See id.* ¶ 57. Anthem, for its part, claims that the parties ultimately did reach an agreement providing for a lump sum. *See* Def.'s Br. at 27. Anthem has provided what it asserts is the binding agreement, although it is signed only by the Plan and not by Anthem. *See* Def.'s Br. Ex. B (ECF No 15-3).

Plaintiffs assert five counts against Anthem. The first three arise under Section 406(a)(1) of ERISA, 29 U.S.C. § 1106(a)(1), and allege that the payments Anthem received from the Plan constituted unlawful "prohibited transactions." Am. Compl. ¶¶ 82-102. Count IV alleges that Anthem breached its contract with the Plan by failing to make the quarterly refund payments that Plaintiffs claim are owed for 2015. *Id.* ¶¶ 103-109. Count V alleges in the alternative that, even if there was no written contract, Anthem was obligated to make the quarterly refund payments under a theory of unjust enrichment. *Id.* ¶¶ 110-114.

Anthem has moved to dismiss the ERISA claims under Rule 12(b)(6). Those claims, Anthem argues, are improper because they seek legal (as opposed to equitable) relief that ERISA does not afford in this context. Def.'s Br. at 9-12. Anthem also argues that Plaintiffs fail to state

a prohibited-transaction claim, and that two of the three claims are time-barred. *Id.* at 12-26, 28-30. Anthem has also moved to dismiss the two common law claims under Rule 12(b)(1). Anthem argues that it did not owe any payments until 2017, after this case was filed, and that as a result these claims are not ripe. *See* Def.'s Br. at 26-28.

## II.  Legal Standard

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to 'assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint.'" *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)).  "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).  "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.*  "To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "plaintiffs bear the burden of establishing jurisdiction." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017).  District courts "may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under [Rule] 12(b)(1) on the complaint standing alone." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  In such cases courts must, as when reviewing a Rule 12(b)(6) motion, "accept[] as true all of the factual allegations

contained in the complaint." *KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151, 1157 (D.C. Cir. 2003). The Court may also rely, "where necessary," on "undisputed facts evidenced in the record." *Id.* at 1157 n.7. But where the Court seeks to rely "upon its own resolution of disputed facts," it must provide an "explicit explanation of its findings" after affording appropriate "procedural protections" to the parties. *Herbert*, 974 F.2d at 197-98. While district courts "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss," *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)), the district court "should usually defer its jurisdictional decision until the merits are heard" if the jurisdictional facts "are inextricably intertwined with the merits of the case." *Herbert*, 974 F.2d at 198.

### III. Analysis

As explained below, the Court agrees with Anthem that Plaintiffs fail to state a prohibited-transaction claim under ERISA. Therefore, the first three counts of the Amended Complaint will be dismissed. However, the Court concludes that Plaintiffs' contract and unjust enrichment claims, as pleaded, are ripe and may proceed.

#### A. Prohibited-Transaction Claims

The Court will examine each of Plaintiffs' prohibited-transaction claims (Counts I, II, and III) in turn, concluding that each should be dismissed.

##### 1. Count I

Section 406(a)(1) of ERISA prohibits certain transactions between benefit plans and "parties in interest," a term defined to include plan fiduciaries and persons "providing services to such plan." *See* 29 U.S.C. §§ 1002(14)(A)-(B), 1106(a)(1). This provision "supplements the fiduciary's general duty of loyalty . . . by categorically barring certain transactions deemed

'likely to injure the pension plan.'" *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)). Among the transactions prohibited are "furnishing of goods, services, or facilities between the plan and a party in interest" and "transfer to . . . a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(C)-(D). Section 408 of ERISA provides various exemptions to the transactions prohibited by Section 406, and authorizes the Secretary of Labor to institute further exemptions by regulation. *See id.* § 1108.

Plaintiffs allege that Anthem—merely by underwriting the insurance that the VSTD Plan provided, processing claims for benefits, and being paid for these services—engaged in prohibited transactions. As neither party disputes, those transactions caused Anthem to become a "party in interest," because it was "providing services" to the Plan. Am. Compl. ¶ 85 (citing 29 U.S.C. § 1002(14)). But under Plaintiffs' interpretation, these transactions were also prohibited because, absent an exemption, the statute prohibits "parties in interest" from either furnishing services to the Plan or receiving payments for those services. *See id.* ¶ 84 (citing 29 U.S.C. § 1106(a)(1)(C)-(D)). That is, Plaintiffs claim, the very transactions that caused Anthem to be a "party in interest" were prohibited because Anthem was a "party in interest." As such, under Plaintiffs' interpretation of the statute, ERISA categorically prohibits the provision of services to employee benefit plans in exchange for compensation, absent an exemption.

Anthem argues that Plaintiffs' allegations are legally insufficient. In Anthem's view, the transactions at issue—its provision of services to the Plan in exchange for compensation—cannot both have caused Anthem to become a party in interest and constituted a prohibited transaction with a party in interest. *See* Def.'s Br. at 12-17. Rather, under its interpretation, "there must be a preexisting relationship between the entity and plan that arose outside of the allegedly prohibited

transactions." *Id.* at 13. Plaintiffs reject that reading of the statute, and also argue that, even if Anthem's *initial* contract with the Plan was not prohibited, then Anthem's renewal of that contract was, because Anthem was already a party in interest by that point. *See* Pls.' Opp'n at 15.

The Court agrees with Anthem and concludes that Plaintiffs' allegations are insufficient to state a claim under the statute. The Court will begin by examining Plaintiffs' theory that ERISA prohibits all furnishing of services in exchange for compensation. The Court will then examine Plaintiffs' alternative argument that ERISA prohibits the Plan's renewal of its contract with Anthem.

### a. Whether ERISA Prohibits All Furnishing of Services in Exchange for Payment

The core of the parties' dispute is whether ERISA categorically prohibits all provision of services to plans in exchange for compensation absent an exemption. Section 3, the definitional section of ERISA, defines a "party in interest" as including "any fiduciary" of a plan and any "person providing services to such plan." 29 U.S.C. § 1002(14)(A)-(B). Section 406 prohibits "furnishing of goods, services, or facilities between the plan and a party in interest" and "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." *Id.* § 1106(a)(1)(C)-(D). Neither party disputes that Anthem, by providing services to the Plan (some of which also caused Anthem to take on fiduciary responsibilities), became a "party in interest" under Section 3. Viewed in isolation, as Plaintiffs urge, these subsections of Section 3 and Section 406 could be read to prohibit Anthem, a "party in interest," from providing services to the Plan or being paid for those services.

But the flawed nature of Plaintiffs' interpretation becomes apparent when the Court looks—as it must—beyond the particular subsections they cite to the overarching text, structure

and purpose of the statute. "[T]o prevent statutory interpretation from degenerating into an exercise in solipsism, [courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law." *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 504 (D.C. Cir. 2013) (first alteration in original) (quoting *Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1014 (D.C. Cir. 1999)).

The Court starts with the text of Section 406(a)(1), which categorically prohibits five types of transactions:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> >
> > (B) lending of money or other extension of credit between the plan and a party in interest;
> >
> > (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> >
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
> >
> > (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a)(1).

As the text of Section 406(a)(1) shows, Congress drew a distinction between prohibiting certain transactions with *anyone*, and prohibiting those transactions with a party in interest. Subsection (E) is the first kind of prohibition: it prohibits plans from acquiring employer securities (that is, securities "issued by an employer of employees covered by the plan," 29 U.S.C. § 1107(d)(1)), under certain conditions, from *anyone*. Subsections (A) through (D), by contrast, are more limited. They do not categorically prohibit plans from engaging in certain

types of transactions with any person or entity. They do not, for example, prohibit the "furnishing of services to the plan in exchange for compensation," full stop. Rather, they only prohibit such transactions with "a party in interest." If this limitation is to be given any meaning, Subsections (A) through (D) cannot be read to categorically prohibit the very transactions that cause a person to obtain the status of a party in interest. Otherwise, Subsections (A) through (D) would be just like Subsection (E): they would prohibit plans from engaging in certain forms of economic activity with *anyone*, regardless of that person or entity's relationship to the plan.

Therefore, Section 406(a)(1) does not admit of Plaintiffs' interpretation, which is, as another court has observed, grounded in circular reasoning: the transactions were prohibited because Anthem was a party in interest, and Anthem was a party in interest because it engaged in the prohibited transactions. *See Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (KBF), 2017 WL 3701482, at *13 (S.D.N.Y. Aug. 25, 2017). Rather, the statute only prohibits such service relationships with persons who are "parties in interest" by virtue of some other relationship—for example, with the employer who sponsors the plan. It does not prohibit a plan from paying an unrelated party, dealt with at arm's length, for services rendered.

A close reading of ERISA's exemptions from these prohibitions further confirms that Plaintiffs' reading of Section 406(a)(1) is untenable. For example, Plaintiffs' reading fits poorly with the exemption codified by Section 408(b)(5). That exemption provides that plans may purchase life insurance, health insurance, and annuities from a licensed insurer if (i) "no more than adequate consideration" is paid and (ii) the insurer is the employer sponsoring the plan (or one of certain other interested entities). 29 U.S.C. § 1108(b)(5). If all furnishing of insurance services in exchange for payment were prohibited, as Plaintiffs claim, then prong (ii) of this exemption would make no sense: why exempt *only* insurers that have a clear conflict of interest,

10

allowing them to sell insurance for "no more than adequate consideration," while completely prohibiting contracts with other, disinterested insurers? This exemption makes perfect sense, however, if Congress was specifically concerned that Section 406(a)(1) might steer plans away from prohibited (but potentially efficient) transactions with interested insurers, particularly employers that are insurers, and toward nonprohibited (but potentially less efficient) transactions with insurers that are not parties in interest.[1] Accordingly, Congress authorized the otherwise prohibited dealings with those interested insurers, provided that plans pay "no more than adequate consideration"—a safeguard plans do not need when contracting with disinterested insurers.

Similarly, Section 408(b)(6)'s exemption underscores the conclusion that Plaintiffs' reading is not sustainable. That exemption covers "any ancillary service by a bank," but only if that bank is a fiduciary. 29 U.S.C. § 1108(b)(6). Such "ancillary services" may be offered only for reasonable compensation and if accompanied by certain other safeguards. *See id.* Under Plaintiffs' reading, this exemption would be meaningless because the *core* service provided by the bank—that is, the service that caused the bank to become a fiduciary—would remain prohibited. Banks would never have occasion to provide "ancillary" services, because they would be prohibited from providing the *antecedent* core service. But Section 408(b)(6) makes perfect sense if Section 406(a)(1) allows the fiduciary to provide one service to the plan (and

---

[1] This reading is confirmed by ERISA's legislative history. The conference report explains that, "if the employer is an insurer qualified to do business in a State (or the District of Columbia)," then "it would be contrary to normal business practice to require the plan of an insurance company to purchase its insurance from another insurance company." H.R. Rep. No. 93-1280, at 314 (1974) (Conf. Rep.), *as reprinted in* 1974 U.S.C.C.A.N. 5038, 5094.

thereby to become a party in interest) and prohibits only the furnishing of other, *additional* services.[2]

Plaintiffs' reading also frustrates the well-accepted purpose of both Section 406(a)(1) and the statute as a whole. Section 406(a)(1) is intended to "prohibit certain transactions that 'generally involve uses of plan assets that are potentially harmful to the plan.'" *Danza v. Fidelity Mgmt. Trust Co.*, 533 F. App'x 120, 125 (3d Cir. 2013) (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996)). That is, it prohibits "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed*, 517 U.S. at 893. And the Supreme Court has cautioned against extending Section 406(a)(1) to prohibit transactions that "cannot reasonably be said to share that characteristic." *Id.* Contracting at arm's length with unrelated service providers plainly does not share that characteristic: it is not a deal struck with "plan insiders." And prohibiting such contracts would make little sense, as it would turn Section 406(a)(1) into "a statutory provision that proscribes [a] retirement pension plan's most basic operations." *Sacerdote*, 2017 WL 3701482, at *14. Indeed, Plaintiffs' interpretation is "potentially harmful" to plans because it discourages service providers from contracting with them in the first place. A change of heart (or leadership) could easily inspire plans to claim that the service provider's bargained-for compensation was unreasonable, and because the Section 408 exemptions are generally considered to be affirmative

---

[2] Here too, the legislative history confirms this reading of the statute. In discussing this exemption, the conference report notes that "generally a fiduciary is not to be able to provide '*multiple services*' to a plan" absent an exemption. H.R. Rep. No. 93-1280, at 314 (1974) (Conf. Rep.) (emphasis added), *as reprinted in* 1974 U.S.C.C.A.N. 5038, 5095; *see also* 120 Cong. Rec. 29,932 (1974) (statement of Sen. Harrison A. Williams) (explaining the need for exemptions where "a fiduciary also provides *other services* to a plan" (emphasis added)), *as reprinted in* 1974 U.S.C.C.A.N. 5038, 5187. As this implies, ERISA does not prohibit a fiduciary from providing a *single* service.

defenses, service providers would be unable to ward off such lawsuits until after costly discovery, at the earliest.  *See id.* at *13.  The potential for strike suits would serve only to narrow the pool of available service providers, ultimately to the detriment of ERISA plans.  These considerations confirm what the entire text and structure of the statute compel: that a plaintiff cannot allege a prohibited transaction merely by claiming that the defendant provided services to an ERISA plan in exchange for bargained-for consideration.[3]

The reading proposed by Plaintiffs would also create a conflict between ERISA's prohibited-transaction provisions and widely accepted law concerning the setting of fiduciary compensation.  While the D.C. Circuit has not yet addressed the issue, other circuits have concluded that ERISA does not generally impose a duty on plan fiduciaries relating to the setting of their compensation.  *See Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 185-86 (D.D.C. 2017) (collecting cases).  That is, if a plan fiduciary negotiates the terms of its compensation with the plan at arm's length, and then adheres to those terms, its receipt of that compensation is unrelated to its fiduciary role and thus cannot be in breach any of its fiduciary

---

[3] Plaintiffs argue that the Department of Labor has taken a different view, quoting the following language from a Department of Labor regulation: "[A] service relationship between a plan and a service provider would constitute a prohibited transaction, because any person providing services to the plan is defined by ERISA to be a 'party in interest' to the plan."  Reasonable Contract or Arrangement Under Section 408(b)(2), 77 Fed. Reg. 5632, 5632 (Feb. 3, 2012).  As an initial matter, it is not at all clear that this passing comment, found in a regulation relating to the exemption for service contracts in Section 408(b)(2) of ERISA, represents the Department of Labor's considered interpretation of the prohibited-transaction provisions of Section 406(a)(1).  Even if it did, however, the Court would not defer to the Department's interpretation, because— as explained above—no ambiguity on this point remains after considering ERISA's "text, structure, purpose, and legislative history."  *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014) (quoting *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001)).

duties.  *See id.*[4]  Plaintiffs' theory would effectively unravel this rule: because fiduciaries are "parties in interest," plans could always seek to claw back fiduciaries' compensation under Section 406(a)(1).

Finally, it bears noting that the Court's reading of the statute does not render toothless ERISA's inclusion of service providers as parties in interest.  For example, a prohibited transaction *does* occur when a service provider receives payments *beyond* its bargained-for compensation with the plan.  In particular, a plan's fiduciaries may not improperly benefit a service provider with unauthorized or sham payments.  *See Lockheed*, 517 U.S. at 895 n.8.  Courts have thus found that attorneys engage in prohibited transactions when they obtain loans from ERISA plans they represent, *Nieto v. Ecker*, 845 F.2d 868, 873 (9th Cir. 1988), or are "paid for services they did not render," *Concha v. London*, 62 F.3d 1493, 1503-04 (9th Cir. 1995) (citing *Nieto*).  *See also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 600-01 (8th Cir. 2009) (plan trustee allegedly received "kickbacks" from mutual funds in exchange for their inclusion in plan's 401(k) program).[5]  But Count I is not based on any such allegation—rather, it is based purely on Anthem's receipt of bargained-for consideration as a service provider.  *See*

---

[4] Of course, if a fiduciary has the ability to change its own compensation, its exercise of that ability does implicate its fiduciary duties.  *See Abraha*, 243 F. Supp. 3d at 186.  That nuance, however, is not relevant to this case.

[5] Some language in *Braden* provides support to Plaintiffs' reading of the statute.  *See* 588 F.3d at 600-01.  Nonetheless, the Court interprets *Braden* to stand for the less sweeping proposition for which it is cited above.  *Braden* involved "kickback" payments alleged *not* to have been bona fide compensation for services rendered.  *See id.* at 590.  Indeed, the implication in that case was that the trustee had, in its fiduciary capacity, exercised control over its own compensation through the alleged kickback scheme.  *See Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 513 F. App'x 78, 80 (2d Cir. 2013) (interpreting *Braden* as based on the plan trustee's alleged self-dealing); *Sacerdote*, 2017 WL 3701482, at *14 (similar).  Moreover, *Braden* only addressed fiduciary liability, not the circumstances under which a service provider could be held liable in a nonfiduciary capacity.  *See* 588 F.3d at 600-01.

14

Am. Compl. ¶¶ 85-87.  Plaintiffs do make such allegations in Count III, which concerns the alleged payments to Carney and is discussed below.

Although few courts have analyzed this interpretive question in depth, the Court's conclusion is in accord with the weight of the authority on point.  Indeed, the Court has identified only one circuit-level decision that squarely addresses this issue, an unpublished Third Circuit decision that similarly accepts Anthem's interpretation of the statute.  *Danza*, 533 F. App'x at 125-26.  There is also a published Eighth Circuit decision that offers some support for Plaintiffs' interpretation, although, as explained above, that case is distinguishable.  *Braden*, 588 F.3d at 600-01; *see supra* note 5.  In addition, there are a few unpublished district court opinions that support Plaintiffs' interpretation.  *Divane v. Nw. Univ.*, No. 16-cv-8157, 2018 WL 2388118, at *10 (N.D. Ill. May 25, 2018); *Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs., Inc.*, No. 1:09-cv-1164 (WSD), 2012 WL 12948705, at *18 & n.27 (N.D. Ga. Jan. 11, 2012); *Ronches v. Dickerson Emp. Benefits, Inc.*, No. 2:09-cv-4279 (MMM) (PJWx), 2009 WL 10669571, at *17-18 (C.D. Cal. Oct. 30, 2009).  The weight of authority, however, appears to support Anthem's reading.  *Patrico v. Voya Fin., Inc.*, No. 16-cv-7070 (LGS), 2018 WL 1319028, at *7 (S.D.N.Y. Mar. 13, 2018); *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *10 (S.D.N.Y. Sept. 29, 2017); *Sweda v. Univ. of Pa.*, No. 16-cv-4329, 2017 WL 4179752, at *11 (E.D. Pa. Sept. 21, 2017); *Sacerdote*, 2017 WL 3701482, at *13-14; *Fite v. Merrill Lynch & Co*, No. 8:10-cv-008 (DOC) (ANx), 2010 WL 11556808, at *7 (C.D. Cal. Nov. 2, 2010); *UFCW Local 56 Health & Welfare Fund v. Brandywine Operating P'ship, L.P.*, No. 05-cv-2435 (JEI), 2005 WL 3555390, at *2-4 (D.N.J. Oct. 28, 2005).

For these reasons, the prohibited-transaction claim in Count I must be dismissed.  The only "transaction" alleged is that Anthem insured the short-term disability benefits for the Plan's participants.  And Anthem, like all insurers, made money by collecting more in premiums than it paid in claims.  That is not a prohibited transaction under ERISA.

### b.     Whether ERISA Prohibits the VSTD Plan's Renewal of its Contract with Anthem

Plaintiffs claim that, even if the foregoing analysis is true, it does not warrant dismissal of Count I because Anthem engaged in additional transactions with the Plan after becoming a party in interest that: (1) renewed the contract at higher rates effective on January 1, 2012, and (2) expanded its insurance coverage to include bus workers in addition to rail workers, also effective on January 1, 2012.  *See* Pls.' Opp'n at 11-13.  But on examination, neither of these theories alters the analysis set forth above.

Plaintiffs' first theory is that Anthem's renewal of the contract is a prohibited transaction even if the original contract is not.  *See id.* at 11.  This theory, however, suffers from the same flaw discussed above.  But for the renewal agreement, Anthem would have ceased to be a party in interest at the end of the initial contract.  Therefore, Plaintiffs seek, once again, to prohibit the same transactions that caused Anthem to be a party in interest.

This theory appears to respond to cases holding that the absence of a "prior relationship" meant there was no prohibited transaction.  *Fite*, 2010 WL 11556808, at *7; *see also Danza*, 533 F. App'x at 125 (no prohibited transaction where the defendant "was not a party in interest at the time the [relevant agreement] was signed").  But the "prior relationship" formulation is imprecise.  ERISA does not necessarily prohibit plans from dealing with persons they have dealt with previously.  This is apparent from the definition of "party in interest," which includes persons "providing services" to the plan but not persons who "have provided" such services in

the past. *See* 29 U.S.C. § 1002(14). Nor does Section 406(a)(1) prohibit the plan from

"negotiating" or "signing" services contracts with parties in interest. Rather, what it prohibits is

the performance of those contracts: the "*furnishing* of goods, services, or facilities between the

plan and a party in interest," 29 U.S.C. § 1106(a)(1)(C) (emphasis added), and the "transfer" of

plan assets to pay for them, *id.* § 1106(a)(1)(D).[6] Because the performance of a renewal contract

typically occurs *after* the initial contract ends, and thus after the service provider has ceased to be

a party in interest by virtue of the initial contract, signing the renewal contract does not cause a

prohibited transaction to occur. And neither does performance of the renewal contract, since (as

explained above) the furnishing of services to a plan cannot both cause the service provider to be

a party in interest and constitute a prohibited transaction under Section 406(a)(1).

Again, ERISA's purpose and structure confirm what its text provides. Prohibiting the

renewal of agreements with service providers who have no other relationship to the plan would

do nothing to prevent "sweetheart deals" of the type Congress sought to avoid. *Fite*, 2010 WL

11556808, at *7. Such a rule would, however, encourage service providers to lock ERISA plans

into long-term contracts, something that ERISA is generally understood to discourage. *See*

*Comerica Bank*, 2012 WL 12948705, at *18 n.27 ("[T]he legislative history reveals Congress

was specifically concerned with the danger that a Plan would become locked into a long-term,

disadvantageous service contract, and thus the DOL regulations define such contracts as

unreasonable.").[7] In light of all of the above, Plaintiffs' first theory does not save their claim.

---

[6] For this reason, the Court disagrees with a prior district court case that, failing to appreciate this nuance in the statutory text, held that renewals do constitute prohibited transactions. *See Brock v. Gerace*, 7 Empl. Benefits Cas. (BNA) 1713, 1715-16 (D.N.J. 1986).

[7] Interpreting ERISA to prohibit contract renewals would also conflict with widely-accepted law concerning the setting of fiduciary compensation, which holds that plan fiduciaries may freely

Plaintiffs' second theory is that the Plan engaged in a prohibited transaction when it expanded the scope of Anthem's services to cover short-term disability insurance for bus workers in addition to rail workers. *See* Pls.' Opp'n at 11. This theory also fails.

Plaintiffs' second theory effectively posits that, even if Anthem's initial provision of insurance to rail workers was not prohibited because that transaction was what caused Anthem to become a party in interest, Anthem's provision of insurance to bus workers was a separate transaction, one prohibited by Section 406(a) because Anthem was already a party in interest by virtue of the rail-worker insurance. The Court has identified only one potential basis for this theory in the statute: a prohibition, suggested by ERISA's structure and legislative history, against providing "multiple services" to a plan. As discussed above, the exemption in Section 408(b)(6) suggests that, while fiduciary banks can provide one service to a plan, they cannot provide additional, ancillary services to that plan absent an exemption. *See supra* pp. 11-12. ERISA's legislative history similarly suggests that fiduciaries cannot simultaneously provide "multiple services" that are qualitatively different. *See supra* note 2; *see also* H.R. Rep. No. 93-1280, at 309 (1974) (Conf. Rep.), *as reprinted in* 1974 U.S.C.C.A.N. 5038, 5090 (stating that "brokerage houses" would be prohibited from providing "both discretionary investment management and brokerage services to the same plan").

But even assuming that a "multiple services" claim is cognizable under Section 406(a)(1), it cannot be based on a change in the quantity of a *single* service provided. That would require interpreting Section 406(a)(1) to mean that, because a service provider has furnished a certain amount of a service at a previous point in time, it cannot now furnish a

---

negotiate their compensation provided they do so at arm's length. *See supra* pp. 13-14. Courts applying this law do not appear to treat renewals differently from initial agreements. *See, e.g.*, *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1129-30, 1132 (7th Cir. 1983).

greater amount of that service. Nothing in ERISA's text, structure, purpose, or legislative history suggests that result. To the contrary, as already explained, ERISA's prohibition against transactions with service providers is not based on prior relationships. The fact that a service provider previously furnished a different amount of the service in question is simply not relevant under Section 406(a)(1). Rather, unless one accepts Plaintiffs' flawed and circular reading of the statute, what matters is whether the service provider, at the time it is furnishing that service, has a separate relationship with the plan that makes it a party in interest. Under the "multiple services" theory, such a separate relationship would exist if the service provider were simultaneously furnishing a different service of a fiduciary nature. But it is not enough to furnish a single service, even if the quantity changes over time.

Plaintiffs' second theory fails because it rests on just such a quantitative change, not any allegation that Anthem simultaneously provided two qualitatively different services to the Plan. Plaintiffs claim that Anthem, when it renewed its contract with the VSTD Plan for the 2012 calendar year, agreed to provide the same type of insurance to a larger number of Plan participants. The only alleged difference between the insurance offered to rail and bus employees is that each had a different "schedule of benefits" and different premiums. Am. Compl. ¶¶ 13, 32. The renewal thus left unchanged the nature of the services furnished: insuring plan participants' short-term disability benefits. Indeed, Plaintiffs themselves describe this change as merely having "increase[d] the scope of [Anthem's] services." Pls.' Opp'n at 11.

In sum, Plaintiffs' two alternative theories cannot save their claim. These theories ultimately rest on the same flawed interpretation of Section 406(a)(1): that Anthem, by providing disability insurance to the Plan, both became a service provider to the plan and engaged in a prohibited transaction. Therefore, Count I must be dismissed.

### 2.    Count II

Count II alleges that Anthem's receipt of premiums for the 2015 calendar year was a prohibited transaction because it falls outside the scope of the exemption in Section 408(b)(2), which covers "[c]ontracting or making reasonable arrangements" for necessary services "if no more than reasonable compensation is paid therefor."  29 U.S.C. § 1108(b)(2).  Specifically, Count II asserts that Section 408(b)(2) "requires the existence of a contract or written agreement," meaning that Anthem cannot rely on Section 408(b)(2) if it is right that there was no binding contract in place at the time.  *See* Am. Compl. ¶¶ 92-93.  This count appears to be pleaded in the alternative to Plaintiffs' breach of contract claim (Count IV), which alleges that there was a binding contract in place at the time.  *See id.* ¶ 106.

Count II effectively relies on the same theory as Count I to explain why the payments to Anthem were prohibited under Section 406(a)(1): that Anthem was a service provider and thus a party in interest.  *See id.* ¶ 93.  Count II simply offers a different reason why, in Plaintiffs' view, those transactions fail to qualify for the exemption in Section 408(b)(2): while Count I asserts that Anthem cannot rely on the exemption because its compensation was unreasonably high, *see id.* ¶¶ 87-90, Count II asserts that the exemption does not apply because Anthem received its compensation outside the scope of a binding contract, *see id.* ¶¶ 92-95.  But whether an exemption applies is irrelevant unless there is a prohibited transaction.  *See, e.g.*, *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 98 (3d Cir. 2012) (explaining that ERISA's exemptions do "not create independent affirmative duties").  Because Count II is entirely derivative of the prohibited-transaction theory in Count I, it must be dismissed for the same reasons set forth above.

### 3.    Count III

Count III is different from Counts I and II: it arises from the payments made through Anthem to Carney.  The Court concludes that this claim fails as well, but for a different reason:

assuming that Plaintiffs do properly allege that prohibited transactions occurred, they provide no basis for recovery from Anthem because it did not retain the proceeds of these transactions, nor have Plaintiffs sufficiently pleaded that Anthem otherwise profited from them.

Plaintiffs allege that Anthem paid "kickbacks" in the form of commission payments to Carney, who was not actually providing "broker services" as he apparently claimed. Am. Compl. ¶ 79. These payments may have constituted prohibited transactions on the theory that they were "sham" compensation for services not actually rendered. *See supra* pp. 14-15. Moreover, Plaintiffs claim that, on at least one occasion, Carney passed some of this money on to Futhey, the VSTD Plan trustee who allegedly caused the transactions to occur. *See* Am. Compl. ¶ 74. Thus, the transactions could also potentially constitute prohibited fiduciary self-dealing. *See* 29 U.S.C. § 1106(b); *Iola*, 700 F.3d at 97. Plaintiffs assert that the transactions were in fact prohibited and that Anthem should be required to disgorge the full amount of the Carney payments. Am. Compl. ¶ 100.

In order to recover that amount, however, Plaintiffs must show that the payments to Carney—or profits or proceeds deriving from them—remain in Anthem's possession. Plaintiffs seek to hold Anthem liable as a nonfiduciary participant in prohibited transactions. *See* Am. Compl. ¶ 97; Pls.' Opp'n at 7-9. Such liability arises from Section 502(a)(3) of ERISA, which authorizes suits for "appropriate equitable relief." 29 U.S.C. § 1132(a)(3). And such relief consists of "restitution of the [unlawfully obtained] property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom." *Harris Trust*, 530 U.S. at 250; *see also Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 658 (2016) (holding equitable recovery under ERISA extends only to funds in defendant's possession and traceable to the unlawfully

obtained assets); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 215 (2002) (explaining that *Harris Trust* established an equitable remedy for "specific property (or its proceeds) held by the defendant"). At a minimum, Plaintiffs must allege that Anthem profited or earned some other benefit from the Carney payments that it can be required to disgorge. *See Spear v. Fenkell*, No. 13-cv-2391, 2016 WL 5661720, at *31-34 (E.D. Pa. Sept. 30, 2016) (discussing potential availability of accounting and disgorgement as equitable remedies after *Montanile*).

In this case, Anthem plainly has not retained the allegedly unlawful payments themselves—it passed them on to Carney. Plaintiffs have in fact affirmatively alleged that Anthem did not retain any portion of the payments. They claim that the "payments to Carney increased, dollar for dollar, the amount of premiums paid by VSTD," and that Anthem's premiums declined by the exact amount of Carney's commission when those payments ceased. Am. Compl. ¶ 78. And while Plaintiffs argue that profits can be recovered in equity even if they are not directly traceable to the prohibited transactions, *see* Pls.' Opp'n at 20, Plaintiffs have not provided any basis to conclude that Anthem's profits resulted directly or indirectly from the Carney payments.

Plaintiffs do allege, in conclusory fashion, that Anthem benefited insofar as the "commission payments allowed Anthem to secure the business of providing [short-term disability] benefits to the Plan." Am. Compl. ¶ 97. But the Amended Complaint is devoid of any concrete facts that explain or support this allegation. Rather, in Plaintiffs' telling, Anthem served as nothing more than a middleman passing along payments orchestrated by others, including Futhey, who chose Carney to receive the payments. *See id.* ¶¶ 72, 74, 78. And Anthem continued to receive the VSTD Plan's business long after the payments to Carney

ended.  *See id.* ¶¶ 59, 61.  There are, of course, cases where a kickback scheme draws the legitimacy of an entire contract into question.  *See, e.g.*, *Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Tr.*, 51 F.3d 1319, 1325-26 (7th Cir. 1995).  But Plaintiffs have not adequately alleged Anthem's participation in a scheme that tainted its entire contract with the Plan, such that it was not an arm's-length bargain.  The Court notes that Carney (a former UTU employee) is not alleged to have been a party in interest to the VSTD Plan; nor is his alleged co-conspirator, Martella (who sold insurance products to SMART members).  *See* Am. Compl. ¶¶ 61, 71.  Plaintiffs thus fail to explain how the payments to Carney amounted to "kickbacks," in the sense of corrupt payments to Plan insiders.  The one exception is the alleged $2,000 payment from Carney to Futhey, the only true "kickback" alleged in the complaint.  *See id.* ¶ 74. However, there is no allegation that Anthem caused, knew about, or had reason to know about the payment to Futhey.  *See id.*  Therefore, the allegations in the complaint do not implicate any of the premiums that Anthem actually retained.

Finally, Plaintiffs argue that the availability of equitable relief is often a factual issue not fit for resolution on a motion to dismiss.  *See* Pls.' Opp'n at 21-22.  But here, Plaintiffs' own pleadings establish that the funds they seek are not recoverable from Anthem in equity; rather, Plaintiffs seek legal relief from Anthem's general assets.  Therefore, Plaintiffs' claim can be resolved on a motion to dismiss.  *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 159-60 (2d Cir. 2014).

In short, while Plaintiffs have alleged that Anthem served as a conduit for improper payments, they cannot recover those funds from Anthem because it no longer has them or any proceeds or profits relating to them.  Therefore, Count III must be dismissed.

**B.      Contract and Unjust Enrichment Claims**

The Court disagrees with Anthem, however, that Plaintiffs' contract claims are unripe.

"'The ripeness doctrine generally deals with when a federal court can or should decide a case,'

and has both constitutional and prudential facets." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591,

632 (D.C. Cir. 2017) (citation omitted) (quoting *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386

(D.C. Cir. 2012)).   "Ripeness 'shares the constitutional requirement of standing that an injury in

fact be certainly impending.'"   *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101

F.3d 1423, 1427 (D.C. Cir. 1996)).   In general, "claims for breach of contract 'cannot be

described as premature since they speak of damages that have already been suffered and are

being suffered.'"   *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 135 (D.D.C. 2011)

(quoting *Casanova v. Marathon Corp.*, 256 F.R.D. 11, 15 (D.D.C. 2009)).

Here, Anthem claims that the Plan has not yet suffered any injury related to its contract

claims, because the refund payments that Anthem owes the Plan have not yet come due.   *See*

Def.'s Br. at 27-28.   In support of this contention, Anthem attaches a contract executed by the

Plan (but not by Anthem) under which the refund payment would not be due until March 2017,

after this lawsuit was filed, "at the earliest."   *See id.* & Ex. B.   Anthem accuses Plaintiffs of

mischaracterizing the agreement, and claims that the Court can properly consider the text of the

contract in deciding this motion to dismiss.   *See id.* at 27 & n.8.

Anthem's argument fails because, under Plaintiffs' theory, the alleged breach of contract

has already occurred.   Plaintiffs allege that, after months of negotiations, the Plan accepted

Anthem's terms for coverage in 2015 by a letter dated January 30, 2015, attached as Exhibit A to

their complaint.   *See* Am. Compl. ¶¶ 104-106 & Ex. A.   The letter purports to memorialize the

"Trustees' understanding that . . . the amount of the 50% sharing would be transferred to [the

Plan] quarterly."   *See id.* Ex. A.   Plaintiffs further allege that Anthem failed to make these

quarterly payments when required.  *See id.* ¶ 108.  And Plaintiffs specifically dispute that the

contract attached by Anthem to its motion to dismiss represents the binding agreement between

the parties.  *See* Pls.' Opp'n at 27.  Thus, Anthem has merely raised a factual dispute over which

document represents the parties' binding agreement, and Plaintiffs have pleaded a claim for

breach of contract that is ripe.  Plaintiffs' claim for unjust enrichment—which they plead in the

alternative on the assumption that there was no binding contract—is ripe for similar reasons.

Therefore, Anthem's motion to dismiss Counts IV and V will be denied.

**IV.**     **Conclusion and Order**

For all of the above reasons, Anthem's motion to dismiss (ECF No. 15) is **GRANTED**

**IN PART** and **DENIED IN PART**.  Counts I, II, and III of Plaintiffs' Amended Complaint are

**DISMISSED** for failure to state a claim on which relief can be granted.  Counts IV and V,

however, may proceed.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: June 6, 2018