**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOSEPH SELLERS, JR., et al.,

     *Plaintiffs*,

     v.

ANTHEM LIFE INSURANCE COMPANY,

     *Defendant*.

Civil Action No. 16-2428 (TJK)

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is a cautionary tale about contract negotiations and a monument to Murphy's Law. Plaintiffs Joseph Sellers, Jr., and Richard McClees, the trustees of a disability-benefits plan—the Plan, for short—sued Defendant Anthem Life Insurance Company. They alleged (among other things) that Anthem either breached two January 2015 contracts by failing to pay the Plan money owed or—if those contracts are not enforceable—unjustly enriched itself at the Plan's expense. Anthem argues that the contracts governing the parties' dealings were not created until over a year later in 2016, that under *those* contracts Anthem has paid the Plan all it is owed, and that Plaintiffs' claims fail even if those contracts are unenforceable. On these grounds, Anthem moves for summary judgment on both counts. Plaintiffs cross-move for partial summary judgment on the enforceability of the 2016 contracts. And they oppose Anthem's motion, arguing that the Court cannot resolve on summary judgment whether the purported January 2015 contracts are enforceable or whether their unjust-enrichment claim is viable.

In summary, the Court finds that there is no genuine dispute of material fact as to whether the alleged January 2015 contracts are enforceable. They are not. But genuine disputes of material fact prevent the Court from deciding whether the 2016 contracts are enforceable. For that reason,

the Court cannot conclude that Plaintiffs' unjust-enrichment claim fails as a matter of law.  Thus, for all the below reasons, the Court will grant in part and deny in part Anthem's motion for summary judgment and deny Plaintiffs' cross-motion for partial summary judgment.

## I.   Factual Background

At all times relevant here, Plaintiffs Joseph Sellers, Jr., and Richard McClees ("Plaintiffs") were residents of Virginia and the trustees of a benefits plan ("Plan") sponsored by the International Association of Sheet Metal, Air, Rail and Transportation Workers ("Union").  ECF No. 54-1 ¶¶ 1–2, 38, 40–41; ECF No. 67 ¶¶ 38, 40–41.  In these roles, Plaintiffs worked out of the Union's Washington, D.C., headquarters.  ECF No. 54-1 ¶¶ 39, 42–43; ECF No. 67 ¶¶ 39, 42–43.  The Plan provides disability benefits to Union members employed in the rail and bus industries and is regulated under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* ECF No. 54-1 ¶¶ 1–3, 37, 46; ECF No. 67 ¶¶ 37, 46.  The Plan maintains two separate schedules of disability benefits: one for rail-industry employees, the other for bus-industry employees.  ECF No. 54-1 ¶ 47; ECF No. 67 ¶ 47.

Anthem Life Insurance Company ("Anthem"), an Indiana corporation headquartered there, began providing disability insurance to the Plan's rail-industry members in 2010 and to the Plan's bus-industry members in 2012.  ECF No. 14 ¶ 16; ECF No. 22 ¶ 17; ECF No. 54-1 ¶¶ 2–3.  For several years, Anthem provided coverage to both sets of members under a "non-participating arrangement" with the Plan.  ECF No. 54-1 ¶ 4.  Under this non-participating arrangement, Anthem assumed the entire insurance risk, meaning that if claims paid by Anthem exceeded premiums paid to Anthem, Anthem would suffer the loss, but if premiums paid to Anthem exceeded claims paid by Anthem, Anthem would reap the profit.  *Id.* ¶¶ 4, 50; ECF No. 67 ¶ 50.  Anthem reportedly profited handsomely under this arrangement.  ECF No. 54-1 ¶ 59; ECF No. 67 ¶ 59.

In late 2014, Plaintiffs and other representatives of the Plan began negotiating with Anthem representatives over the terms of the parties' arrangement for the 2015 calendar year.   ECF No. 54-1 ¶ 5.  Marc Rifkind, the Plan's counsel based out of Washington, D.C., was the Plan's primary point of contact with Anthem, and Mike Slifka, an account manager for Anthem based out of Ohio, was Anthem's primary point of contact with the Plan.  *See, e.g.*, ECF No. 52-4 at 2–4.

Although the parties' representatives at first discussed renewal under a non-participating arrangement, in December 2014 they broached the possibility of transitioning to a "participating arrangement" for the 2015 calendar year.  ECF No. 52-1 at 23; ECF No. 54-1 ¶¶ 7–8, 59, 61; ECF No. 67 ¶¶ 59, 61.  Under this participating arrangement, Anthem would charge higher premiums, but the parties would share the insurance risk and thus share any loss or profit.  *See* ECF No. 52-1 at 23–24; ECF No. 54-1 ¶ 50; ECF No. 67 ¶ 50.  The parties dispute what, exactly, they discussed as to how any profit-sharing amounts would be calculated under this participating arrangement. *Compare* ECF No. 51-2 ¶¶ 9–14, *and* ECF No. 67 ¶¶ 62–70, *with* ECF No. 54-1 ¶¶ 9–14, 62–70. But meeting minutes of their negotiations at least reflect some high-level discussion about a "50/50 split" of "excess receipts."  *See* ECF No. 52-1 at 35.

On January 30, 2015, the Plan decided to agree to a participating arrangement for the 2015 calendar year.  ECF No. 52-1 at 35–36.  That same day, Rifkind emailed Slifka with a letter attachment stating that the trustees "accept Anthem's offer set forth" in a previously shared "Final Product & Pricing Package" specifying the premiums to be paid and benefits to be provided under a participating arrangement for the 2015 calendar year for each benefits schedule.  *See* ECF No. 52-4 at 2, 6; ECF No. 52-5 at 2–7.  That "Package" did not, however, contain any terms specifying how the profit sharing between Anthem and the Plan would work.  *See* ECF No. 52-5 at 5, 7.  Thus,

Rifkind asked Slifka to prepare written agreements containing "the terms governing the Participating Contracts for Rail and Bus" for the Plan's "review and approval." ECF No. 52-5 at 4; *see also* ECF No. 51-4 at 4–6. Rifkind also told Slifka of the trustees' "understanding" about one term they expected to be in those documents—that Anthem would pay the Plan quarterly the "50% sharing." ECF No. 52-5 at 3.

Slifka responded to Rifkind later that same day: "[o]n behalf of Anthem, thank you for this wonderful news. We are excited that we will continue to serve" the Plan's participants. ECF No. 53-6 at 2. And he said that the parties would need to meet soon to "start th[e] process" of implementing the participating arrangement. *Id.* The Plan then began paying premiums at the participating-arrangement levels. ECF No. 54-1 ¶ 89; ECF No. 67 ¶ 89. And Anthem began "operating in ways that would suggest" an agreement was in place, including by accepting participating-arrangement-level premiums, paying participating-arrangement-level benefits, and reserving funds to pay the Plan the profit-sharing amount owed "based on what [Anthem] knew about the final structure of that agreement at that point in time." ECF No. 54-4 at 14; ECF No. 54-14 at 3; *see also* ECF No. 54-1 ¶¶ 89–90; ECF No. 67 ¶¶ 89–90.

In May 2015, Slifka finally forwarded to Rifkind two draft "Experience Rating Refund" ("ERR") Agreements containing the terms to govern the parties' profit sharing under the participating arrangement. ECF No. 51-5 at 2–8. One draft governed the profit sharing for the rail-industry-members policy, and the other draft governed the profit sharing for the bus-industry-members policy, but the drafts were otherwise identical. *Compare* ECF No. 51-5 at 3–5, *with* ECF No. 51–5 at 6–8. *See also* ECF No. 51-4 at 6; ECF No. 54-1 ¶ 21.

These drafts specified that Anthem would pay the Plan annually any profit-sharing amounts owed. ECF No. 51-5 at 3–4, 6–7. They also contained a formula for how the profit-sharing amount

would be calculated, specifying that the Plan would receive 50% of the difference of "Paid Premium − Incurred Claims – [Anthem's] Expenses." *Id.* at 3, 6. By definition, Anthem's "Expenses" constituted "25% of paid premium." *Id.* at 4, 7. Thus, the profit sharing would be a 50/50 split, but that split would be of funds left over after Anthem took out its "Expenses." The drafts also included an early-termination-penalty clause that said, in essence, that the Plan would forfeit any profit-sharing payments otherwise owed to it if it terminated the participating arrangement before December 31, 2015. *See id.* at 3–4, 6–7. The drafts also contained a provision requiring the Plan to give Anthem a "written request" for payment, after which Anthem had sixty days to fulfill that request. *See id.* The drafts contained several other provisions addressing payment-related issues, the duration of the ERR Agreements, termination of the ERR Agreements, and other, more ancillary matters, including an Ohio choice-of-law clause and an integration clause. *See generally* ECF No. 51-5 at 3–8.

Rifkind responded to Slifka's email forwarding these drafts, asking him how the "25% expense ratio" was "calculated." ECF No. 52-9 at 5. After some back-and-forth between Rifkind and Slifka on this point, Rifkind told Slifka that they "need[ed] to nail down this agreement." *Id.* at 2–5. He suggested meeting in person "to discuss each of the components of the expense-ratio calculation" as well as the terms governing the "frequency" of profit-sharing payments. *Id.* at 2.

These efforts to "nail down" the ERR Agreements apparently did not go well. Rifkind wrote Slifka in September 2015 to tell him that the Plan was not "interest[ed] in [the] participatory contract that Anthem proposed." ECF No. 52-10 at 2. He said that the Plan would proceed as if a non-participating arrangement was in place for the entire 2015 calendar year and demanded either a retrospective refund or a prospective credit for the higher, participating-arrangement premiums the Plan had paid. *Id.* Slifka forwarded Rifkind's email to Mike Wozny, then-president of

Anthem.  *See* ECF No. 54-18 at 2–3.  Wozny responded by musing whether the parties could change the nature of the arrangement mid-year, particularly given the "formal acceptance letter" Anthem had received from the Plan on January 30, 2015, as well as other "indications of acceptance."  *See* ECF No. 54-18 at 2; ECF No. 66-6 at 3.

Slifka later responded to Rifkind, telling him that Anthem "accepts the requested change" to revert to a non-participating arrangement (though effective September 30, 2015, rather than retroactive to January 1, 2015).  ECF No. 52-11 at 2–3.  He also said that the change meant the Plan forfeited any profit-sharing amounts it might have received under the "original participating arrangement" given the early-termination-penalty clause, and he advised Rifkind that Anthem could provide a premium discount in future years as a credit of sorts.  *Id.*; ECF No. 54-1 ¶ 24.

A few weeks later, Rifkind replied, telling Slifka that "[i]n light of Anthem's refusal to provide" any credit in 2015, the Plan had "decided to maintain the current participatory arrangement" under a draft ERR Agreement the Plan had prepared that revised the May 2015 drafts.  ECF No. 52-11 at 2.  Those revisions included (1) a new clause stating that each underlying insurance policy would be treated as "an asset" of the Plan and (2) new provisions requiring profit-sharing payments to be disbursed automatically within thirty days after Anthem calculated the profit-sharing amount.  *Compare* ECF No. 51-5 at 6–8, *with* ECF No. 52-11 at 4–7.  Left untouched, however, was the profit-sharing formula from the May 2015 drafts that included a deduction for Anthem's "Expenses" before the 50/50 split would be calculated.  *See* ECF No. 52-11 at 4–5.  Rifkind asked Slifka either to execute the revised version of the agreements and return it to the Plan for counter-signing or to tell him "immediately" of any "proposed changes" Anthem had so that the parties could "wrap this up quickly."  ECF No. 52-11 at 2.  More than a month then passed without Slifka responding, so Rifkind later followed up, asking him to send a signed agreement "ASAP" because

the Plan wanted "to wrap this up by the end of the year."  ECF No. 52-12 at 3.

Slifka finally got back to Rifkind in January 2016, apologizing for the delay and sending him "updated ERR Agreements."  ECF No. 54-1 ¶ 123; ECF No. 67 ¶ 123; ECF No. 52-12 at 5. Slifka asked Rifkind to sign and return the agreements "[i]f everything looks good."  ECF No. 52-12 at 5.  Rifkind overlooked Slifka's January 2016 message, so Slifka resent the updated ERR Agreements in early February 2016.  *Id.* at 2.  These "updated ERR Agreements" were much like the May 2015 drafts.  *Compare* ECF No. 51-5 at 3–8, *with* ECF No. 52-12 at 8–13.  But they contained several revisions, including one adopting the Plan's previous proposal to require profit-sharing payments to be disbursed automatically within thirty days after Anthem calculated the profit-sharing amount.  *Compare* ECF No. 51-5 at 3–8, *with* ECF No. 52-12 at 8–13.

On February 29, 2016, Rifkind emailed Slifka with signed copies of the ERR Agreements along with a notice that the Plan was terminating its relationship with Anthem effective March 31, 2016.  ECF No. 52-13 at 2–3, 5–10.  In his cover email, Rifkind asked Slifka to have the ERR Agreements countersigned and returned to him.  *Id.* at 2.  In the termination notice, Rifkind mentioned that he had deleted the early-termination-penalty clause in the documents because the agreements by their own terms applied only to the 2015 calendar year (meaning that, by February 2016, the clause was moot).  *Id.* at 3.  Further, although not mentioned at all by Rifkind, the ERR Agreements attached to his email contained additional changes to the "updated ERR Agreements" that Slifka had emailed Rifkind in January and early February 2016.  *See* ECF No. 54-1 ¶ 126; ECF No. 67 ¶ 126; ECF No. 54-20; ECF No. 54-21.  But these ERR Agreements still contained the profit-sharing formula that included a deduction for Anthem's "Expenses" before the 50/50 split would be calculated, and they retained the Ohio choice-of-law clause and the integration clause that had been in the drafts since May 2015.  *See* ECF No. 52-13 at 5, 7–8, 10.

In March 2016, Slifka responded.  ECF No. 54-1 ¶ 130; ECF No. 67 ¶ 130; ECF No. 52-17 at 2–3.  In his email, Slifka told Rifkind that Anthem had "re-visited" its position on the Plan's September 2015 proposal to retroactively make the arrangement for the 2015 calendar year non-participating.  ECF No. 52-17 at 2.  He then said that Anthem would now agree to do so (at least for the rail-industry-members policy) and that it would refund the Plan the excess premiums charged under the participating arrangement.  *Id.*  And he represented that Anthem would soon forward to the Plan the contract amendments needed to make this change.  *Id.*  Rifkind replied, telling Slifka that the Plan did not agree to retroactively revert to a non-participating arrangement for the 2015 calendar year, that any change to the "existing agreement" needed to be in writing, and that any refund the Plan received would be either returned or accepted as a down payment for the profit-sharing amount the Plan was owed under the "existing Participatory Agreement."  *Id.*

In May 2016, Slifka emailed Rifkind with what Slifka described as "Anthem's terminal accounting" for the participating arrangement for the 2015 calendar year.  ECF No. 52-18 at 2–3.  He also informed Rifkind that Anthem's forthcoming payment under that accounting would "mark[] the official conclusion" of the parties' relationship.  *See id.* at 3.  Rifkind responded, asking how Anthem calculated this terminal profit-sharing payment given that the ERR Agreements specified that the final profit-sharing calculation would not be done until after a "12-month run-out period" following termination (meaning sometime in early 2017).  *See id.* at 2; ECF No. 52-13 at 6; ECF No. 54-1 ¶ 34; ECF No. 67 at 4.

In July 2016, Rifkind had a conference call with representatives from Anthem.  *See* ECF No. 52-19 at 2.  According to a letter Rifkind sent in August 2016 as "follow-up" to that discussion, on that call, the Plan "made it abundantly clear" that its February 2016 "offer" was "no longer on the table."  *See* ECF No. 54-23 at 3.

In August 2016, an Anthem representative emailed Rikfind with the ERR agreements he had signed on February 29, which Wozny had finally countersigned "on or around August 4, 2016." ECF No. 54-1 ¶ 35; ECF No. 52-19 at 2, 6, 10; ECF No. 54-4 at 22. The ERR Agreement for the rail-industry-members policy that Wozny countersigned contained two handwritten changes he made that he later explained were "ministerial" changes to correct "administrative error[s]" in the document. *See* ECF No. 52-19 at 8; ECF No. 54-4 at 16, 19.

The next year, Anthem paid the Plan ███████, representing the amount Anthem owed the Plan under the profit-sharing formula in the 2016 ERR Agreements. *See* ECF No. 51-7 at 2–3; ECF No. 54-1 ¶ 36.

## II.   Procedural Background

In late 2016, Plaintiffs sued Anthem. *See* ECF No. 1. In their operative complaint (filed before Anthem paid the ██████), they brought three ERISA counts, one breach-of-contract count, and one unjust-enrichment count. ECF No. 14 ¶¶ 82–114. As for their breach-of-contract count, Plaintiffs claimed that the parties created enforceable ERR Agreements as of January 30, 2015. *Id.* ¶¶ 106–08. They alleged that the profit-sharing formula in those agreements required Anthem to pay the Plan about $2.4 million, which it has not paid (though this figure does not account for the ██████ Anthem later paid the Plan). *See id.* ¶¶ 103–09; *id.* at 19 ¶ 2. In the alternative, Plaintiffs brought the unjust-enrichment count, in case the January 2015 ERR Agreements they alleged existed are considered unenforceable, and they sought the same $2.4 million under this alternative theory. *See id.* ¶¶ 110–14; *id.* at 19 ¶ 2.

Anthem moved to dismiss. ECF No. 15. The Court granted in part and denied in part that motion, dismissing Plaintiffs' ERISA counts but allowing their other counts to proceed. ECF No. 19 at 1. Anthem then answered, ECF No. 22, and the pared-down case proceeded to discovery.

Anthem now moves for summary judgment, arguing that the 2016 ERR Agreements are enforceable, defeating both of Plaintiffs' remaining claims as a matter of law, and that Plaintiffs' breach-of-contract claim fails even if the 2016 ERR Agreements are unenforceable. *See generally* ECF No. 51-2. Plaintiffs oppose, and they cross-move for partial summary judgment, arguing that the 2016 ERR Agreements are not enforceable. *See generally* ECF No. 54.

## III.   Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is "material" if it is capable of affecting the outcome of the litigation under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, the parties cross-move for summary judgment, each party must carry its own burden under the summary-judgment standard. *Fay v. Perles*, 59 F. Supp. 3d 128, 132 (D.D.C. 2014).

In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmovant, draw all reasonable inferences in that party's favor, and avoid weighing the evidence or making credibility determinations. *See Thompson v. District of Columbia*, 967 F.3d 804, 812–13 (D.C. Cir. 2020). But, in opposing summary judgment, the nonmovant must do more than "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, if the evidence on which the nonmovant relies in opposing summary judgment is "'merely colorable' or 'not significantly probative'" such that no reasonable factfinder could rule in that party's favor based on that evidence, then "summary judgment may be granted." *See Bradley v. D.C. Pub. Sch.*, 222 F. Supp.

3d 24, 28 (D.D.C. 2016) (quoting *Anderson*, 477 U.S. at 249–50).  Thus, although at summary judgment the Court does not weigh the evidence and find the facts, the Court must decide whether the nonmovant's evidence is probative enough that there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249; *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

## IV.    Analysis

Anthem seeks summary judgment on Plaintiffs' remaining claims for breach of contract and unjust enrichment.  As for the breach-of-contract claim, Anthem argues alternatively that (1) the 2016 ERR Agreements are enforceable and govern the parties' profit-sharing obligations, under which it is undisputed that Anthem has paid the Plan the profit-sharing amount it was owed; and (2) even if the 2016 ERR Agreements are unenforceable, the purported ERR Agreements that Plaintiffs claim were created on January 30, 2015, on which their breach-of-contract claim depends, also are unenforceable.  As for the unjust-enrichment claim, Anthem argues that this claim fails because enforceable contracts (the 2016 ERR Agreements) govern the parties' dealings, thus precluding an unjust-enrichment claim based on those dealings.  For their part, Plaintiffs cross-move for partial summary judgment, arguing that the 2016 ERR Agreements are unenforceable.  And they otherwise oppose Anthem's motion for summary judgment, arguing that whether the January 2015 ERR Agreements are enforceable and (in the alternative) whether Anthem was unjustly enriched if no ERR Agreements existed cannot be resolved at summary judgment.

### A.    Plaintiffs' Breach-of-Contract Claim

The Court holds that District of Columbia law governs Plaintiffs' breach-of-contract claim and that, under District of Columbia law, the purported January 2015 ERR Agreements on which Plaintiffs' breach-of-contract claim depends are unenforceable.  Thus, it will grant in part Anthem's motion for summary judgment as to Plaintiffs' breach-of-contract claim.

### 1.      Choice of Law

The same general choice-of-law rule applies to both of Plaintiffs' remaining claims, whether the Court exercises diversity or supplemental jurisdiction over them, because either way the Court must apply the choice-of-law rules of the jurisdiction in which it sits. *See Ideal Elec. Sec. Co. v. Int'l Fidelity Ins.*, 129 F.3d 143, 148 (D.C. Cir. 1997). Thus, the District of Columbia's choice-of-law rules apply to choice-of-law questions in this case. *See Parker v. K&L Gates, LLP*, 76 A.3d 859, 869 (D.C. 2013).[1] Under those choice-of-law rules, each issue adjudicated requires its own choice-of-law analysis. *See Hartley v. Dombrowski*, 744 F. Supp. 2d 328, 336 (D.D.C. 2010) (citing *Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004)).

The first step of the choice-of-law analysis under District of Columbia law is "to determine whether a 'true conflict' exists—that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different." *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992). If there is no "'true conflict'" in the laws of the competing jurisdictions, then the Court must "apply the law of the District of Columbia by default." *See id.* (citing *Fowler v. A&A Co.*, 262 A.2d 344, 348 (D.C. 1970)).

Here, there are three potentially interested jurisdictions: Indiana, where Anthem is head-quartered; Ohio, where Slifka mainly negotiated with the Plan on Anthem's behalf; and the District of Columbia, where Rifkind mostly negotiated with Anthem on the Plan's behalf. The parties

---

[1] Granted, generally speaking, "parties to a contract may specify the law they wish to govern," and the District of Columbia typically treats as binding such choice-of-law clauses. *See Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980). Based on this, Anthem argues that the 2016 ERR Agreements' Ohio choice-of-law clauses apply, requiring the Court to apply Ohio substantive law. But where, as here, the parties dispute the enforceability of the contract containing the choice-of-law clause, the Court must apply the ordinarily applicable choice-of-law rules rather than assuming the enforceability of the contract and giving effect to its choice-of-law clause. *See, e.g.*, *CD Int'l Enters., Inc. v. Rockwell Capital Partners, Inc.*, 251 F. Supp. 3d 39, 43 n.2 (D.D.C. 2017).

argue only over whether Ohio or District of Columbia law applies, and the Court agrees with their implicit position that Indiana's minimal interest in this dispute (arising solely from the fact that Anthem is headquartered there) under the relevant choice-of-law factors eliminates it from consideration as the source of applicable law. *See Bode v. Grenier, LLP v. Knight*, 808 F.3d 852, 864 (D.C. Cir. 2015); *Ideal Elec. Sec.*, 129 F.3d at 148. As between Ohio and the District of Columbia, there is no "true conflict" in the laws of these jurisdictions on any issue relevant to the analysis of Plaintiffs' breach-of-contract claim, so District of Columbia law applies "by default." *See GEICO*, 958 F.2d at 1141. To illustrate as much, the Court will cite Ohio law alongside District of Columbia law in the next section.

## 2.    Legal Principles

Under District of Columbia law, the "party asserting the existence of a contract has the burden of proof on that issue." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995); *accord Wilhelm v. Coverstone*, 118 N.E.3d 970, 979 (Ohio Ct. App. 2018). Plaintiffs claim that the parties created enforceable (but mostly oral) ERR Agreements on January 30, 2015. Thus, to carry their burden, Plaintiffs must show that (1) the parties intended to be bound as of January 30, 2015, and (2) the parties agreed on all material terms of the ERR Agreements at that time. *See United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 337–38 (D.C. 2015); *accord Nilavar v. Osborn*, 711 N.E.2d 726, 732 (Ohio Ct. App. 1998). Thus, intent to be bound "alone is not enough," and if "the parties fail to agree to all material terms, no contract is formed." *Jack Baker*, 664 A.2d at 1239; *accord Bldg. Indus. Consultants, Inc. v. 3M Parkway, Inc.*, 911 N.E.2d 356, 360 (Ohio Ct. App. 2009).

As for the intent element, the parties' intentions are determined by their objective manifestations of intent, not their actual, subjective intentions. *See Dyer v. Bilaal*, 983 A.2d 349, 357

(D.C. 2009); *accord Nilavar*, 711 N.E.2d at 733.  Mutual intent to be bound typically is manifested objectively by an offer from one party and acceptance by the other party.  *See, e.g.*, *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 141 (D.D.C. 2011); *accord Garrison v. Daytonian Hotel*, 663 N.E.2d 1316, 1317–18 (Ohio Ct. App. 1995).

As for the material-terms element, it is "axiomatic that the parties to a contract are free to decide for themselves what is material and what is not." *T St. Dev., LLC v. Dereje & Dereje*, 586 F.3d 6, 12 (D.C. Cir. 2009) (citing *Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985)); *accord Shelton v. Twin Twp.*, 30 N.E.3d 1047, 1054 (Ohio Ct. App. 2015). Granted, some terms, like "[d]efault provisions" or terms addressing "incidental or collateral" matters, are not typically material.  *See Tauber v. Quan*, 938 A.2d 724, 730 (D.C. 2007); *United House of Prayer for All People*, 112 A.3d at 338; *accord Santomauro v. Sumss Prop. Mgmt., LLC*, 134 N.E.3d 1250, 1263 (Ohio Ct. App. 2019).  And other terms, like the subject matter of the agreement, price, payment terms, quantity, quality, and duration, are "usually" material.  *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 103 (D.D.C. 2004) (citing *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990)); *accord N. Side Bank & Tr. Co. v. Trinity Aviation, LLC*, 153 N.E.3d 889, 895 (Ohio Ct. App. 2020).  But again, at bottom, a material term is a term that "the parties consider to be" material to their agreement.  *See Strauss v. NewMarket Global Consulting Grp., LLC*, 5 A.3d 1027, 1033 (D.C. 2010); *accord Ruffian, L.L.C. v. Hayes*, No. 09AP-948, 2011 WL 683770, at *10 (Ohio Ct. App. Feb. 24, 2011).  And what the parties consider material "is a question of fact that depends on the particular circumstances of the case." *Blackstone v. Brink*, 63 F. Supp. 3d 68, 77 (D.D.C. 2014); *accord RHDK Oil & Gas, LLC v. Willowbrook Coal Co.*, No. 2020 AP 08 0017, 2021 WL 1529304, at *5 (Ohio Ct. App. Apr. 16, 2021).

As for the mostly oral nature of the purported January 2015 ERR Agreements, "[a]bsent any contrary requirement under a statute of frauds, parties may enter into enforceable oral contracts, as long as they agree to all material terms and intend to be bound by their oral agreement." *Jack Baker*, 664 A.2d at 1238; *accord* 17 Ohio Jur. 3d Contracts §§ 7, 63 (3d ed. Nov. 2021 update) (collecting authorities).[2]  So the fact that a purported contract includes terms that the parties only "*verbally* agreed to" does "not necessarily defeat" a breach-of-contract claim premised on that contract.  *See Queen v. Schultz*, 747 F.3d 879, 885 (D.C. Cir. 2014).  But where, as here, the parties to a purported oral agreement "contemplate a subsequent written contract," the party claiming that the parties created an enforceable contract before executing the subsequent written agreement has a "particularly onerous" burden to prove as much.  *See Jack Baker*, 664 A.2d at 1238; *cf.* 17 Ohio Jur. 3d Contracts § 64 at text accompanying n.3 (identifying several reasons why such a purported contract will be held unenforceable).  Unless that party "can show that the contemplated written document is to be a mere memorial of the agreement already reached, it cannot prevail."  *Jack Baker*, 664 A.2d at 1239 (internal quotation marks omitted); *accord Smith v. Amil Tellers of Dramatics, Inc.*, No. 1-78-32, 1978 WL 215714, at *4 (Ohio Ct. App. Nov. 16, 1978).

To be sure, the parties' "failing to agree upon the form and terms of a memorial does not invalidate an enforceable contract previously made" between them.  *See Dyer*, 983 A.2d at 359

---

[2] Anthem raised a statute-of-frauds affirmative defense in its motion for summary judgment, but this defense has been "excluded from the case," *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1107 (D.C. Cir. 2019) (cleaned up), because Anthem failed to raise it in its answer and the Court denied Anthem leave to amend its answer to raise it, *see* Minute Order of June 12, 2020. *See also Kelly v. Richard Wright Public Charter Sch.*, 317 F. Supp. 3d 564, 566 (D.D.C. 2018); *Howard Univ. v. Wilkins*, 22 A.3d 774, 786 n.12 (D.C. 2011); *Mossa v. W. Credit Union, Inc.*, 616 N.E.2d 571, 573 (Ohio Ct. App. 1992).

n.9; *accord Turoczy Bonding Co. v. Mitchell*, 118 N.E.3d 439, 445 (Ohio Ct. App. 2018); *cf. Restatement (Second) of Contracts* § 27 cmt. d ("Even though a binding contract is made before a contemplated written memorial is prepared and adopted, the subsequent written document may make a binding modification of the terms previously agreed to.").  Even so, if the contemplated written document "is to contain any material term that is not already agreed on, no contract has yet been made." *Jack Baker*, 664 A.2d at 1239 (internal quotation marks omitted); *accord Joseph v. Doraty*, 144 N.E.2d 111, 113–14 (Ohio Ct. App. 1957).

Five factors ("*Jack Baker* factors") guide the analysis of whether an "oral agreement in contemplation of a written contract is enforceable":

(1) whether the contract is one usually put in writing,
(2) whether there are few or many details,
(3) whether the amount involved is large or small,
(4) whether it requires a formal writing for a full expression of the covenants and promises, and
(5) whether the negotiations indicate that a written draft is contemplated as the final conclusion of the negotiations.

*Jack Baker*, 664 A.2d at 1240; *accord Mid-States Dev. Co. v. Am. Aggregates Corp.*, No. CA 6569, 1980 WL 352554, at *3 (Ohio Ct. App. Oct. 23, 1980).  Summary judgment is "proper where the evidence on these factors is overwhelmingly in favor of one position." *Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*, 967 F. Supp. 1382, 1387 (D.D.C. 1997) (internal quotation marks omitted), *aff'd*, 190 F.3d 556, 563–65 (D.C. Cir. 1999).

### 3.    Analysis

The evidence on the *Jack Baker* factors overwhelmingly favors Anthem's position that the January 2015 ERR Agreements are not enforceable, so Anthem is entitled to summary judgment on Plaintiffs' breach-of-contract claim. *See, e.g.*, *Novecon*, 967 F. Supp. at 1387–88.

First, the parties' own dealings show that contracts like the ERR Agreements are usually put in writing.  On January 30, 2015, when Rifkind told Slifka that the Plan accepted Anthem's offer for a participatory arrangement for the 2015 calendar year, Rifkind asked Slifka to create ERR Agreements for "review and approval" by the Plan.  *See* ECF No. 52-4 at 7.  Once Anthem prepared draft ERR Agreements for the Plan's review and approval, the parties engaged in protracted negotiations over the terms in those drafts, exchanging several revised drafts in the process. During this process, Rifkind stressed the need for written agreements signed by both parties to "wrap . . . up" the matter.  *See, e.g.*, ECF No. 52-1 at 33; ECF No. 52-11 at 2; ECF No. 52-12 at 3; ECF No. 52-13 at 2.  In other words, the "aura of this transaction was one of formality."  *See Jack Baker*, 664 A.2d at 1240.

Second, the ERR Agreements ended up containing many details governing exactly how much Anthem would owe the Plan, under what conditions Anthem would have to make payment, when Anthem would have to make payment, how long the agreements lasted, among other terms. While not as complex as the agreement at issue in *Jack Baker*, *see* 664 A.2d at 1240–41, this still was a complicated arrangement with "numerous details," *see Novecon*, 967 F. Supp. at 1387.

Third, the amount of money at issue in the purported January 2015 ERR Agreements is large.  The Plan claims it is owed more than $2.4 million under them.  *See* ECF No. 14 at 19 ¶ 2; ECF No. 54-1 at 15 ¶ 36.  That is a "considerable amount of money."  *See Jack Baker*, 664 A.2d at 1240; *accord Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1246, 1251 (D.C. Cir. 2007) (involving $1.3 million or more); *Novecon*, 967 F. Supp. at 1387 (involving $200,000).

Fourth, "the complexity of this agreement . . . indicates that a formal writing would be required for a full expression of the covenants and promises."  *Novecon*, 967 F. Supp. at 1387

(cleaned up).  This point is borne out by the fact that, after January 30, 2015, the Plan spent significant time negotiating the details of the draft ERR Agreements with Anthem.  The drawn-out back-and-forth over the draft documents shows that it "would be difficult indeed for an oral agreement alone to set forth all the material, detailed terms" of the parties' profit-sharing-related obligations.  *See Jack Baker*, 664 A.2d at 1240; *Novecon*, 967 F. Supp. at 1387.

Fifth, and perhaps "most importantly," the parties' "negotiations indicated that a written draft was contemplated as the final conclusion of negotiations."  *See Novecon*, 967 F. Supp. at 1387 (cleaned up).  Again, in his January 30, 2015 letter, Rifkind asked Slifka to create written ERR Agreements for the Plan's "review and approval."  *See* ECF No. 52-4 at 7; *Novecon*, 190 F.3d at 565 (noting that a similar statement was a "significant indication[] of nonfinality").  Once Anthem did so, Rifkind asked Slifka to meet so that the parties could "nail down" the agreements.  *See* ECF No. 52-9 at 2; *Steven R. Perles, P.C.*, 473 F.3d at 1250–51 (finding that an alleged oral agreement was not enforceable partly because, after the oral agreement purportedly was created, the offeree asked the offeror to "sit down and work it out").  After further back-and-forth, the Plan finally agreed to Anthem's profit-sharing formula that had been a sticking point, though it made other revisions to the draft ERR Agreements that Rifkind then sent to Slifka.  *See* ECF No. 52-11 at 2; *Jack Baker*, 664 A.2d at 1241 (concluding that an alleged oral contract was unenforceable when the party claiming it existed took "weeks before responding" to the subsequent written agreement and, when responding, "made several changes" to it).  Rifkind then asked Slifka to execute those revised drafts or propose changes "immediately" so that the parties could "wrap this up quickly," a request he later reiterated.  *See* ECF No. 52-11 at 2; ECF No. 52-12 at 3; *cf. Simplicio v. Nat'l Scientific Pers. Bureau, Inc.*, 180 A.2d 500, 502 (D.C. 1962) (finding that a letter did not

create an enforceable contract where it was "clearly the intent" of the offeree that there "be a duly signed contract embodying the final agreement of the parties").

In short, the Plan's own conduct shows that executed, written ERR Agreements were "contemplated as the final conclusion of negotiations." *See Jack Baker*, 664 A.2d at 1240. And that "the parties unquestionably contemplated a written agreement," coupled with their continued negotiations and talk of "finalizing their agreement," belies Plaintiffs' claim that they "already had a contract." *See Miller v. Holzmann*, 471 F. Supp. 2d 122, 125 (D.D.C. 2007).

Plaintiffs counter that, after January 30, 2015, both parties performed as if a participating arrangement was in place. The Plan paid participating-arrangement-level premiums, Anthem paid participating-arrangement-level benefits, and Anthem even began reserving funds "based on what [it] knew about the final structure of that agreement at that point in time" to make any profit-sharing payment owed to the Plan. *See* ECF No. 54-14 at 3. Certainly, "'partial performance' . . . should be taken into consideration to determine whether a binding contract existed," as it is evidence that the parties believed they had agreed to all material terms and intended to be bound thereby. *See Novecon*, 967 F. Supp. at 1388; *Steven R. Perles, P.C.*, 473 F.3d at 1249. But that evidence is not significantly probative here given the parties' "subsequent negotiations" over the draft ERR Agreements. *See Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C. 1981).

Plaintiffs argue that these later negotiations reflect Anthem trying to change the terms of the January 2015 ERR Agreements. But inexplicably, despite being a sophisticated party represented throughout these negotiations by counsel, the Plan never said so at the time. Consider the Plan's response to the profit-sharing formula in the May 2015 draft ERR Agreements—undisputedly a material term of those agreements given that it was the heart of those agreements, the key sticking point in negotiations between May and September 2015, and the very term the parties are

fighting over now.  *See Blackstone*, 63 F. Supp. 3d at 77.  When the Plan received the draft ERR Agreements containing this formula, Rifkind's response was not to protest that Anthem had changed this already-agreed-upon material term but instead to ask a series of questions about it. He then suggested that the parties meet to "nail down" the agreements, and when they evidently failed to do so, he told Slifka that the Plan was rejecting the ERR Agreements that Anthem "proposed." Thus, Rifkind said, the Plan would be reverting to a non-participating arrangement for the entire 2015 calendar year.  Further, perhaps most tellingly, after the Plan rescinded that rejection, it then agreed to the profit-sharing formula in the May 2015 draft ERR Agreements.  That would make no sense if, as Plaintiffs now claim, that formula changed the parties' original deal to the Plan's significant detriment.

True, the parties discussed a "50/50 split" of "excess receipts," although they dispute what they discussed about the details of that split.  Plaintiffs rely heavily on Sellers's and another trustee's alleged "understanding" as of January 30, 2015, about exactly what funds would be subject to the split.  *See* ECF No. 54-7 at 3–4; ECF No. 54-8 at 3–5.  But even accepting the evidence Plaintiffs cite on this point as true, it is not proof that is significantly probative of whether the parties had a contract then, given the Plan's own conduct afterward reflecting that the parties had not worked out "*what* they agreed to split." *See Queen*, 747 F.3d at 886.

The same is true for the early-termination-penalty clause, another term that Plaintiffs now claim resulted from Anthem trying to change the parties' January 2015 deal.  When Rifkind told Slifka in September 2015 that the Plan was terminating the participating arrangement and reverting to a non-participating arrangement, Slifka responded by telling him that in doing so the Plan forfeited any profit-sharing payment owed it because of the early-termination-penalty clause.  Rifkind

then replied that the Plan would "maintain the current participatory arrangement," thereby agreeing to the early-termination-penalty clause. Again, this would have been a strange way to proceed if, as Plaintiffs now claim, this clause was yet another way Anthem was trying to change the enforceable agreements the parties already had created. If that were so, the Plan would have insisted on enforcing the terms of these alleged January 2015 agreements and told Anthem that it owed a profit-sharing payment even if the Plan terminated the participating arrangement early.

In sum, all the *Jack Baker* factors support Anthem's position that the purported January 2015 ERR Agreements are not enforceable. And Plaintiffs have failed to come forward with evidence sufficient for a reasonable jury to conclude otherwise. Thus, there is no genuine dispute of material fact that the alleged January 2015 ERR Agreements are not enforceable, and the Court will grant Anthem's motion for summary judgment as to Plaintiffs' breach-of-contract claim.

## B.   Plaintiffs' Unjust-Enrichment Claim

The Court holds that District of Columbia law governs Plaintiffs' unjust-enrichment claim and that, under District of Columbia law, genuine disputes of material fact remain that preclude granting either party summary judgment on this claim.

### 1.   Choice of Law

The parties do not address whether District of Columbia or Ohio law governs Plaintiffs' unjust-enrichment claim. But the same "true conflict" rule applicable to Plaintiffs' breach-of-contract claim applies here as well—that is, "[i]f there is no 'true conflict,' the Court applies D.C. law by default." *See Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 8–9 (D.D.C. 2016); *Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 177–78 (D.D.C. 2016). As between Ohio and the District of Columbia, once again, there is no "true conflict" in the laws of these jurisdictions on any issue relevant to the analysis of Plaintiffs' unjust-enrichment claim, so District of

Columbia law applies "by default." *See GEICO*, 958 F.2d at 1141.  Again, to illustrate as much, the Court will cite Ohio law alongside District of Columbia law in the next section.

### 2.  Legal Principles

Under District of Columbia law, an unjust-enrichment claim has three elements: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retained the benefit; and (3) under the circumstances, the defendant's retention of the benefit was unjust.  *In re APA Assessment Fee Litig.*, 766 F.3d 39, 45–46 (D.C. Cir. 2014) (quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C.2005)); *accord Stacy v. Gibson*, 140 N.E.3d 196, 209 (Ohio Ct. App. 2019).[3]  This claim depends on what is "just under all of the circumstances."  *See Mazor v. Farrell*, 186 A.3d 829, 833 (D.C. 2018); *accord San Allen, Inc. v. Buehrer*, 11 N.E.3d 739, 783 (Ohio Ct. App. 2014).  Thus, an unjust-enrichment claim requires a "fact-intensive inquiry."  *Chin-Teh Hsu v. New Mighty U.S. Tr.*, No. 10-cv-1743 (JEB), 2020 WL 588322, at *11 (D.D.C. Feb. 6, 2020); *accord San Allen*, 11 N.E.3d at 783.

Anthem argues that Plaintiffs' unjust-enrichment claim fails because the 2016 ERR Agreements are enforceable and govern the parties' dealings, thus precluding an unjust-enrichment claim based on those dealings.  *See Glasgow v. Camanne Mgmt. Inc.*, 261 A.3d 208, 215 (D.C. 2021); *accord Deffren v. Johnson*, 169 N.E.3d 270, 275 (Ohio Ct. App. 2021).  Plaintiffs argue that, for several alternative reasons, the 2016 ERR Agreements are unenforceable, and they seek summary judgment on this issue.  Thus, the Court returns to the key principles of contract law.

---

[3] Ohio adds as an element that the defendant must have "knowledge . . . of the benefit." *See Stacy*, 140 N.E.3d at 209.  But at least for purposes of the Court's summary-judgment analysis, this additional element does not create a true conflict for choice-of-law purposes.

Again, under District of Columbia law, the "party asserting the existence of a contract has the burden of proof on that issue." *Jack Baker*, 664 A.2d at 1238; *accord Wilhelm*, 118 N.E.3d at 979. Anthem claims that the 2016 ERR Agreements are enforceable. Thus, to carry its burden, it must show both that (1) the parties intended to be bound to those agreements in 2016 and (2) the parties agreed on all material terms of those agreements at that time. *See United House of Prayer for All People*, 112 A.3d at 337–38; *accord Nilavar*, 711 N.E.2d at 732. If "the parties fail[ed] to agree to all material terms, no contract [was] formed," even if they "intended to be bound." *See Jack Baker*, 664 A.2d at 1239; *accord Bldg. Indus. Consultants*, 911 N.E.2d at 360.

As for the intent element, the parties' intentions are determined by their objective manifestations of intent, not their actual, subjective intentions. *See Dyer*, 983 A.2d at 357; *accord Nilavar*, 711 N.E.2d at 733. Mutual intent to be bound typically is manifested objectively by an offer from one party and acceptance by the other party. *See, e.g.*, *RDP Techs.*, 800 F. Supp. 2d at 141; *accord Garrison*, 663 N.E.2d at 1317.

But the "purported acceptance of an offer does not create a valid contract if the accepting party has altered the offer's material terms." *REO Acquisition Grp. v. Fed. Nat'l Mortg. Ass'n*, 104 F. Supp. 3d 22, 28 (D.D.C. 2015) (citing *Malone v. Saxony Co-op Apartments, Inc.*, 763 A.2d 725, 728 (D.C. 2000)); *accord Foster v. Ohio State Univ.*, 534 N.E.2d 1220, 1222 (Ohio Ct. App. 1987).[4] Such an "acceptance" is a counteroffer that must be accepted by the original offeror to form a binding contract. *Malone*, 763 A.2d at 728; *accord Foster*, 534 N.E.2d at 1222.

---

[4] Language from some Ohio cases suggests that an acceptance must mirror "in every respect" the offer to create an enforceable contract. *See, e.g.*, *Foster*, 534 N.E.2d at 1222. But other decisions clarify that an acceptance creates an enforceable contract so long as it does not contain any "material variance" from the offer. *See, e.g.*, *Karas v. Brogan*, 378 N.E.2d 470, 471 (Ohio 1978) (per curiam); *Goldfarb v. The Robb Report, Inc.*, 602 N.E.2d 329, 334 (Ohio Ct. App. 1991).

When a party counteroffers rather than accepting, the counteroffer is extinguished if the other party counter-counteroffers before accepting the counteroffer. *See 1836 S St. Tenants Ass'n, Inc. v. Estate of B. Battle*, 965 A.2d 832, 843 & n.55 (D.C. 2009); *accord Garrison*, 663 N.E.2d at 1318. That said, even if the other party counter-counteroffers before accepting, the original counteroffer remains open for acceptance if either the counterofferor manifests an intention of keeping the counteroffer open or the counter-counterofferor makes clear that it is accepting the counteroffer and merely proposing modifications to the accepted counteroffer. *See 1836 S St. Tenants Ass'n*, 965 A.2d at 843 n.55; *accord* 17 Ohio Jur. 3d Contracts § 20.

As for the material-terms element, again, "the parties to a contract are free to decide for themselves what is material and what is not." *T St. Dev.*, 586 F.3d at 12; *accord Shelton*, 30 N.E.3d at 1054. Granted, some terms, like "[d]efault provisions" or terms addressing "incidental or collateral" matters, are not typically material. *See Tauber*, 938 A.2d at 730; *United House of Prayer for All People*, 112 A.3d at 338; *accord Santomauro*, 134 N.E.3d at 1263. And other terms, like the subject matter of the agreement, price, payment terms, quantity, quality, and duration, are "usually" material. *Calvetti*, 346 F. Supp. 2d at 103; *accord N. Side Bank & Tr. Co.*, 153 N.E.3d at 895. But again, at bottom, a material term is a term that "the parties consider to be" material. *See Strauss*, 5 A.3d at 1033; *accord Ruffian*, 2011 WL 683770, at *10. Materiality "is a question of fact that depends on the particular circumstances of the case." *Blackstone*, 63 F. Supp. 3d at 77; *accord RHDK Oil & Gas*, 2021 WL 1529304, at *5. Relevant circumstances include whether the term conventionally is a material term of the type of contract at issue, whether the parties discussed the term during negotiations so as to suggest its materiality, and whether the term is necessary for the parties to understand how they are expected to perform the contract itself. *See Blackstone*, 63 F. Supp. 3d at 77.

### 3.    Analysis

Anthem argues that summary judgment in its favor is warranted on Plaintiff's unjust-en-richment claim because the 2016 ERR Agreements are valid, enforceable, and govern the parties' dealings, thus precluding such a claim.[5]  Plaintiffs argue, to the contrary, that these ERR Agreements are unenforceable, and they cross-move for summary judgment on this issue.  The threshold issue presented by both motions is whether the Plan accepted Anthem's January/early February 2016 draft ERR Agreements on February 29, 2016.  If the Plan did, Anthem prevails.  If the Plan did not, then the parties' cross-motions require the Court to consider whether events after February 29, 2016, either made the 2016 ERR Agreements enforceable (as Anthem argues) or made them unenforceable (as Plaintiffs argue).  For the below reasons, the Court finds that genuine issues of material fact preclude summary judgment for either party on these issues about the enforceability of the 2016 ERR Agreements.  Thus, the Court will deny Anthem's motion for summary judgment in part as to Plaintiffs' unjust-enrichment claim and deny Plaintiffs' cross-motion for partial summary judgment.

### i.    The Plan's Purported February 29, 2016 Acceptance

Anthem argues that, on February 29, 2016, the Plan accepted the draft 2016 ERR Agreements Anthem had provided it in January/February 2016, making those agreements enforceable and precluding Plaintiffs' unjust-enrichment claim.  In response, Plaintiffs contend that this purported acceptance was ineffective because Rikfind made six material changes to the draft ERR

---

[5] In its reply, Anthem also argued—cursorily and for the first time—that Plaintiffs' unjust-enrichment claim fails even if these ERR Agreements are not enforceable because the Plan ultimately assented to the profit-sharing formula in them, showing that Anthem's application of that formula is not unjust.  The Court declines to consider this argument.  *See, e.g.*, *Elk Assocs. Funding Corp. v. U.S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 26 (D.D.C. 2012).

Agreements Anthem had previously sent him, rendering the Plan's purported acceptance a rejection and counteroffer.[6]  Anthem, to be sure, counters that none of the changes were material.  As discussed below, while Plaintiffs have failed to establish that any one of these changes was material, genuine disputes of material fact exist as to whether the "Asset of the Plan," "Deposit and Withdrawal," and "Final Calculation" revisions *were* material.  Thus, neither party prevails as a matter of law on whether the Plan's February 29, 2016 actions constituted acceptance (as Anthem argues) or rejection and counteroffer (as Plaintiffs argue).

*Asset of the Plan*.  Before sending the signed ERR Agreements back to Slifka on February 29, 2016, Rifkind added a term specifying that the insurance policies underlying each ERR Agreement were "an asset" of the Plan.  *Compare* ECF No. 52-12 at 8, 11, *with* ECF No. 52-13 at 5, 8. The Plan had proposed this term in a prior round of negotiations over the draft ERR Agreements. *See* ECF No. 52-11 at 2, 4.  And this term imposed on the Plan certain obligations under ERISA. *See, e.g.*, 29 U.S.C. § 1002(21)(A); Schedule H, Form 5500, OMB No. 1210-0110.  But the term addressed a collateral matter (one unnecessary for the parties to understand how they were to perform the ERR Agreements themselves, *see Tauber*, 938 A.2d at 730), and Rifkind did not mention this addition when transmitting the signed ERR Agreements to Slifka on February 29.  On this record, a reasonable factfinder could come out either way as to the materiality of this term; neither party prevails.

*Deposit and Withdrawal*.  The draft ERR Agreements Anthem offered the Plan in January/February 2016 provided that the parties would set up a "Claims Stabilization Reserve" account

---

[6] In their reply—the final summary-judgment filing between the parties—Plaintiffs also argued for the first time that this purported acceptance was ineffective because it was not unequivocal.  The Court declines to consider this argument.  *See, e.g.*, *Goldstein v. Treasury Inspector Gen. for Tax Admin.*, 172 F. Supp. 3d 221, 234–35 (D.D.C. 2016).

through which the parties would transmit any profit-sharing (or loss-sharing) payments owed to the other party. *See* ECF No. 52-12 at 8, 11. Those drafts also contained a term specifying that Anthem would make payments into the account "within 60 days of receipt of a written request" from the Plan and that the Plan could withdraw funds "at any time" once funds were disbursed into the account. *Id.* at 9, 12. Rifkind deleted this whole clause, thus eliminating the written-request and sixty-day conditions on Anthem making payment. *See* ECF No. 52-13 at 6, 9. This modified a payment term of the ERR Agreements, which is typically a material term. But Rifkind did not mention this deletion when transmitting the signed ERR Agreements on February 29, and it does not appear this deletion previously had been the subject of negotiations. Again, a reasonable factfinder could come out either way as to the materiality of this term.

*Final Calculation*. The draft ERR Agreements Anthem offered the Plan in January/February 2016 contained the early-termination-penalty clause. *See* ECF No. 52-12 at 8–9, 11–12. Rifkind deleted this entire provision and replaced it with a term stating that Anthem had to deposit the final profit-sharing payment in the "Claims Stabilization Reserve" account within thirty days after the final calculation was done and that the final profit-sharing payment had to be "immediately paid from the . . . account" to the Plan. *See* ECF No. 52-13 at 6, 9. This deletion-and-substitution was related to the deletion of the deposit-and-withdrawal term (taken together, the Plan no longer owed Anthem sixty days' notice to get paid but instead Anthem had to pay the Plan automatically within thirty days after the final calculation) and modified a payment term of the ERR Agreements, suggesting materiality. Yet in transmitting the signed ERR Agreements to Slifka, Rifkind downplayed this change, saying merely that he had "deleted" the early-termination-

penalty clause because it was no longer relevant after December 31, 2015 (when the ERR Agreements terminated automatically).  Again, the Court cannot conclude, one way or another, whether this term is material as a matter of law.

*Computation Period.*  The draft ERR Agreements Anthem offered the Plan in January/February 2016 said that Anthem would calculate the profit-sharing amount the Plan was owed at the end of each "Computation Period," defined as "the period beginning on the effective date of this Agreement and ending 12 months later" (on the day the agreements terminated automatically). *See* ECF No. 52-12 at 8–9, 11–12.  To this definition, Rifkind added that a "Computation Period" was also "each 12-month period thereafter."  ECF No. 52-13 at 6, 9.  Plaintiffs do not explain why this change was material, and the Court is at a loss to see why it was—after all, even as revised by Rifkind, the drafts still provided that there would be a "final Computation Period" ending twelve months after termination.  *See id.*  In other words, one twelve-month Computation Period following termination was already built into the ERR Agreements, and this was to be the final Computation Period.  Rifkind's addition of "each 12-month period thereafter" thus had no effect on the parties' rights and obligations under the ERR Agreements, undermining its alleged materiality. *See Dyer*, 983 A.2d at 358.  Thus, Plaintiffs cannot prevail as a matter of law that this change turned the Plan's purported acceptance into a rejection and counteroffer.

*Notice by Mail.*  The draft ERR Agreements Anthem offered the Plan in January/February 2016 provided that any notice required under the agreement would be deemed sufficient "if sent by first class certified-mail" to the other party.  *See* ECF No. 52-12 at 10, 13.  Rifkind deleted "certified" from this clause.  *See* ECF No. 52-13 at 7, 10.  Plaintiffs do not explain why this minor modification to the notice provision was material, and the Court is at a loss to see why it was.  As

with the "Computation Period" revision, Plaintiffs cannot prevail as a matter of law that this change turned the Plan's purported acceptance into a rejection and counteroffer.

*Rail-to-Bus.*  The two draft ERR Agreements Anthem offered the Plan in January/February 2016 were materially identical except that, in an introductory "Whereas" clause, one referenced the underlying policy providing disability benefits to "rail craft union members" and the other referenced the underlying policy providing disability benefits to "bus craft union members."  *See* ECF No. 52-12 at 8, 11.  Rifkind revised the draft referencing the underlying policy for rail-industry members to say that that underlying policy provided disability benefits to "bus craft union members."  *See* ECF No. 52-13 at 8.

Plaintiffs claim that this change was material because it altered the subject matter of that draft ERR Agreement, making it apply to the bus-industry-members policy rather than to the rail-industry-members policy.  But, as Anthem argues, this is much ado about nothing—or, more precisely, it is much ado about an obvious scrivener's error (and it was not the only one Rifkind made in revising the drafts, *see* ECF No. 54-20 at 2).[7]  Rifkind did not change the underlying rail-industry-members policy referenced in the draft but simply (mis)characterized that policy as providing

---

[7] Plaintiffs argue that Anthem cannot rely on the scrivener's error doctrine to challenge the materiality of this change because Anthem did not request contract reformation.  But in one of the very cases Plaintiffs cite, the court applied that doctrine merely to interpret the contract at issue.  *See Meyer v. Bank of Am., N.A.*, No. 2:18-cv-218, 2019 WL 6467196, at *3–4, *9–10 (S.D. Ohio Dec. 2, 2019).  Other authorities show that the doctrine applies even in the absence of a contract-reformation claim.  *See, e.g., Begner v. United States*, 428 F.3d 998, 1006–07 (11th Cir. 2005); *Luria Bros. & Co. v. Pielet Bros. Scrap Iron & Metal, Inc.*, 600 F.2d 103, 108–09 (7th Cir. 1979).  Further, applying it in this context makes sense—after all, contract reformation is available to "correct[] an *enforceable agreement's* written embodiment to reflect the parties' true agreement."  76 C.J.S. *Reformation of Instruments* § 1 at text accompanying n.16 (Feb. 2022 update) (emphasis added); *accord Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 423–24 (D.C. 2007); *Elkins v. Colburn*, No. 18CA893, 2019 WL 2754096, at *7 (Ohio Ct. App. June 21, 2019).  But if, as Plaintiffs suggest, the inclusion of a scrivener's error in a purported acceptance turned that acceptance into a rejection and counteroffer, there would be no enforceable contract to reform.

benefits to bus-industry members.  Had Rifkind meant to change the subject matter of the agreement, he would have revised the underlying policy referenced, not merely changed (erroneously) how that policy was characterized.[8]

On this record, a reasonable factfinder easily could conclude that this change was simply a scrivener's error and, as such, was not a material change turning the Plan's purported acceptance into a rejection and counteroffer.  *Cf.* 76 C.J.S. *Reformation of Instruments* § 1 at text accompanying n.16; *Lumpkins*, 911 A.2d at 423–24; *Elkins*, 2019 WL 2754096, at *7.  Plaintiffs, then, cannot prevail as a matter of law that this change rendered the Plan's purported acceptance ineffective.

### ii.     Plaintiffs' Alternative Arguments

If the Court could determine as a matter of law that the Plan had accepted Anthem's offer on February 29, then Anthem would be entitled to summary judgment on Plaintiff's unjust-enrichment claim, end of story.  But, as just discussed, the Court cannot reach that conclusion.  Even so, Anthem argues that it should still prevail on the enforceability of the 2016 ERR Agreements even if the Plan's purported acceptance on February 29 was really a counteroffer because Anthem accepted that counteroffer while it was still open for acceptance (perhaps in May 2016 but at least by August 2016).  Plaintiffs raise several alternative arguments for why the 2016 ERR Agreements are unenforceable presuming the Plan counteroffered on February 29, all of which share the premise that events after February 29 extinguished that counteroffer before Anthem accepted it.

---

[8] Further, in March 2016, Anthem told the Plan that it would agree to make the rail-industry-members policy retroactively non-participating for the 2015 calendar year (thereby abrogating the corresponding rail-industry-members ERR Agreement).  Rifkind rejected this proposal and told Slifka that any change to the "existing agreement" needed to be in writing.  Rifkind's response, which presumes the existence of a rail-industry-members ERR Agreement, makes no sense had Rifkind intended to eliminate the rail-industry-members ERR Agreement by making this change in February 2016.

Because neither party is entitled to summary judgment as to whether the Plan's conduct on February 29 constituted either an acceptance or a counteroffer, none of Plaintiffs' alternative arguments here would entitle them to summary judgment on the ultimate issue they raise in their cross-motion, namely, the unenforceability of the 2016 ERR Agreements. Thus, these alternative arguments are relevant at this stage only insofar as they prevent Anthem from obtaining summary judgment as to the enforceability of the 2016 ERR Agreements. The first of Plaintiffs' alternative arguments has this effect, so the Court need not wade through the morass of additional arguments any further beyond that.

Plaintiffs argue that, presuming the Plan counteroffered rather than accepted on February 29, Anthem counter-counteroffered in March 2016 before purporting to accept, extinguishing the Plan's counteroffer. *See 1836 S St. Tenants Ass'n*, 965 A.2d at 843 & n.55. On this record, a reasonable factfinder could so conclude, and that precludes summary judgment for Anthem as to the enforceability of the 2016 ERR Agreements.

Recall that, when Slifka first responded to Rifkind's February 29 email transmitting the signed 2016 ERR Agreements, he told Rifkind that Anthem had "re-visited" the idea of retroactively making the rail-industry-members policy non-participating for the 2015 calendar year and now agreed to do so (thus abrogating the ERR Agreement associated with that policy). In his deposition, Wozny acknowledged that he authorized Slifka to make this "offer" to the Plan to wind up the parties' relationship. *See* ECF No. 54-4 at 25–26. Anthem's March 2016 "offer" is the textbook definition of a counteroffer—"an offer . . . relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer." *Restatement (Second) of Contracts* § 39(1). Ordinarily, that would snuff out the Plan's counteroffer. But Rifkind responded by telling Slifka that the Plan would not agree and that it insisted on maintaining

the "existing Participatory Agreement." This response could be construed as the Plan manifesting its intention to keep its February 29 counteroffer open for acceptance despite Anthem's counter-counteroffer, thus preventing Anthem's counter-counteroffer from extinguishing the counteroffer. *See 1836 S St. Tenants Ass'n*, 965 A.2d at 843 n.55; *Restatement (Second) of Contracts* § 39(2) & illus. 1.

A reasonable factfinder could find for either party on this subissue—for Plaintiffs by concluding that Anthem's counter-counteroffer extinguished the Plan's counteroffer, or for Anthem by concluding that the Plan's response to the counter-counteroffer kept the Plan's counteroffer open. Thus, for this reason alone, Anthem is not entitled to summary judgment that Plaintiffs' unjust-enrichment claim fails because the 2016 ERR Agreements are enforceable.

## V.   Conclusion and Order

For all these reasons, it is hereby **ORDERED** that Anthem's motion for summary judgment, ECF No. 51-2, is **GRANTED IN PART** and **DENIED IN PART** and that Plaintiffs' cross-motion for partial summary judgment, ECF No. 54, is **DENIED**. Judgment is **ENTERED** for Anthem on Plaintiffs' breach-of-contract claim. It is further **ORDERED** that the parties shall file a joint status report by March 24, 2022, informing the Court how they wish to proceed with this case.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 22, 2022